CONSOLIDATED ROCK PRODUCTS CO. ET AL. *v.* DU BOIS.*

No. 400.  Argued February 13, 14, 1941.—Decided March 3, 1941.

---

*Together with No. 444, *Badgley et al.* v. *Du Bois,* also on writ of certiorari, 311 U. S. 636, to the Circuit Court of Appeals for the Ninth Circuit.

512

*Mr. Paul R. Watkins,* with whom *Mr. Dana Latham* was on the brief, for petitioners in No. 400; and *Mr. Graham L. Sterling, Jr.,* with whom *Messrs. Homer I. Mitchell* and *John C. Macfarland* were on the brief, for petitioners in No. 444.

*Mr. Kenneth E. Grant* for respondent.

By special leave of Court, *Solicitor General Biddle,* with whom *Messrs. Richard H. Demuth, Chester T. Lane, Martin Riger, George Rosier,* and *Homer Kripke* were on

the brief, for the Securities and Exchange Commission, as *amicus curiae.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This case involves questions as to the fairness under § 77B of the Bankruptcy Act (48 Stat. 912) of a plan of reorganization for a parent corporation (Consolidated Rock Products Co.) and its two wholly owned subsidiaries [1]—Union Rock Co. and Consumers Rock and Gravel Co., Inc. The District Court confirmed the plan; the Circuit Court of Appeals reversed. 114 F. 2d 102. We granted the petitions [2] for certiorari because of the importance in the administration of the reorganization provisions of the Act of certain principles enunciated by the Circuit Court of Appeals.

The stock of Union and Consumers is held by Consolidated. Union has outstanding in the hands of the public [3] $1,877,000 of 6% bonds secured by an indenture on its property, with accrued and unpaid interest [4]

---

[1] The proceedings under § 77B were instituted in 1935 by the filing of separate voluntary petitions by Consolidated, Union and Consumers. No trustees have been appointed, Consolidated remaining in possession.

[2] The petition in No. 400 raises all of the questions discussed herein, while the petition in No. 444 raises only the question as to the authority of the reorganization court to approve a plan which substitutes one mortgage covering all of the property for so-called divisional mortgages on separate units of that property. The Interstate Commerce Commission and the Securities and Exchange Commission filed memoranda urging that the petition in No. 444 be granted and that the petition in No. 400 be granted to the extent that it raised the same question as that presented by the petition in No. 444.

[3] $102,500 face amount of Union's bonds are held by Consolidated.

[4] As of April 1, 1937, the effective date of the plan. Interest on Union bonds has been in default since March 1, 1934.

thereon of $403,555—a total mortgage indebtedness of $2,280,555. Consumers has outstanding in the hands of the public [5] $1,137,000 of 6% bonds secured by an indenture on its property, with accrued and unpaid interest [6] thereon of $221,715—a total mortgage indebtedness of $1,358,715. Consolidated has outstanding 285,947 shares of no par value preferred stock [7] and 397,455 shares of no par common stock.

The plan of reorganization calls for the formation of a new corporation to which will be transferred all of the assets of Consolidated, Union,[8] and Consumers free of all claims.[9] The securities of the new corporation are to be distributed as follows:

Union and Consumers bonds held by the public will be exchanged for income bonds [10] and preferred stock [11]

---

[5] $63,500 face amount of Consumers' bonds are held by Consolidated.

[6] Interest has been in default since July 1, 1934.

[7] With a preference on liquidation of $25 per share plus accrued dividends.

[8] Reliance Rock Co. is a wholly owned subsidiary of Union whose properties also were to be transferred to the new company.

[9] The claims of general creditors will be paid in full or assumed by the new company.

[10] These bonds will mature in 20 years and will bear interest at the rate of 5 per cent if earned. The interest will be cumulative if not paid. The bonds, as well as the preferred stock, to be issued to Union and Consumers bondholders will be in separate series. The net income of the new company is to be divided into two equal parts: each part to be used to pay, with respect to bonds and preferred stock of each series, first, interest and sinking fund payments on the bonds; second, dividends and sinking fund payments on the preferred stock. Income remaining will be available for general corporate purposes.

[11] The new preferred stock will have a par value of $50 and will carry a dividend of 5 per cent. It will be noncumulative until the retirement of the bonds of the same series except to the extent that net income is available for dividends. Thereafter it will be cumulative.

of the new company. For 50 per cent of the principal amounts of their claims, those bondholders will receive income bonds secured by a mortgage on all of the property of the new company; for the balance they will receive an equal amount of par value preferred stock. Their claims to accrued interest are to be extinguished, no new securities being issued therefor. Thus Union bondholders for their claims of $2,280,555 will receive income bonds and preferred stock in the face amount of $1,877,000; Consumers bondholders for their claims of $1,358,715 will receive income bonds and preferred stock [12] in the face amount of $1,137,000. Each share of new preferred stock will have a warrant for the purchase of two shares of new $2 par value common stock at prices ranging from $2 per share within six months of issuance, to $6 per share during the fifth year after issuance.

Preferred stockholders of Consolidated will receive one share of new common stock ($2 par value) for each share of old preferred or an aggregate of 285,947 shares of new common.

A warrant to purchase one share of new common for $1 within three months of issuance will be given to the common stockholders of Consolidated for each five shares of old common.[13]

The new preferred stock, to be received by the old bondholders, will elect four out of nine directors of the new company; the new common stock will elect the re-

---

[12] All of the new income bonds and preferred stock are to be issued to the public holders of Union and Consumers bonds.

[13] 79,491 shares of new common will be reserved for the exercise of warrants issued to old common stockholders; an additional 60,280 shares of new common, for the exercise of warrants attached to the new preferred.

mainder.[14]   But on designated delinquencies in payment
of interest on the new bonds, the old bondholders would
be entitled to elect six of the nine directors.

The bonds of Union and Consumers held by Consoli-
dated,[15] the stock of those companies held by Consoli-
dated, and the intercompany claims (discussed here-
after) will be cancelled.

In 1929 when Consolidated acquired control of these
various properties, they were appraised in excess of $16,-
000,000 and it was estimated that their annual net earn-
ings would be $500,000.   In 1931 they were appraised
by officers at about $4,400,000, "exclusive of going con-
cern, good will and current assets."   The District Court
did not find specific values for the separate properties
of Consolidated, Union, or Consumers, or for the prop-
erties of the enterprise as a unit.   The average of the
valuations (apparently based on physical factors) given
by three witnesses [16] at the hearing before the master
were $2,202,733 for Union as against a mortgage indebt-
edness of $2,280,555; $1,151,033 for Consumers as against
a mortgage indebtedness of $1,358,715.   Relying on sim-
ilar testimony, Consolidated argues that the value of its
property, to be contributed to the new company, is over
$1,359,000, or exclusive of an alleged good will of $500,-
000, $859,784.   These estimated values somewhat con-
flict with the consolidated balance sheet (as at June 30,
1938) which shows assets of $3,723,738.15 and liabilities
(exclusive of capital and surplus) of $4,253,224.41.
More important, the earnings record of the enterprise

---

[14] It is apparent that the majority of the new common will be held
by the old preferred stockholders even if all warrants are exercised.

[15] See notes 3 and 5, *supra*.

[16] Two officers and one ex-employee.   These valuation figures in-
cluded the properties of Reliance.   See note 8, *supra*.

casts grave doubts on the soundness of the estimated values. No dividends were ever paid on Consolidated's common stock; and except for five quarterly dividends in 1929 and 1931, none on its preferred stock. For the eight and a half years from April 1, 1929, to September 30, 1937, Consolidated had a loss of about $1,200,000 before bond interest but after depreciation and depletion. And except for the year 1929, Consolidated had no net operating profit, after bond interest and amortization, depreciation and depletion, in any year down to September 30, 1937.[17] Yet on this record the District Court found that the present fair value of all the assets of the several companies, exclusive of good will and going concern value, was in excess of the total bonded indebtedness, plus accrued and unpaid interest. And it also found that such value, including good will and going concern value, was insufficient to pay the bonded indebtedness plus accrued and unpaid interest and the liquidation preferences and accrued dividends on Consolidated preferred stock. It further found that the present fair value of the assets admittedly subject to the trust indentures of Union and Consumers was insufficient to pay the face amount, plus accrued and unpaid interest of the respective bond issues. In spite of that finding, the District Court also found that "it would be physically impossible to determine and segregate with any degree of accuracy or fairness properties which originally belonged to the companies separately"; that as a result of unified operation properties of every character "have been commingled and are now in the main held by Consolidated without any way of ascertaining what part, if any thereof, belongs to each or any of the companies separately"; and that, as a consequence, an appraisal "would

---

[17] The hearings on the plan were held before a master during November, 1937.

be of such an indefinite and unsatisfactory nature as to produce further confusion."

. The unified operation which resulted in that commingling of assets was pursuant to an operating agreement which Consolidated caused its wholly owned subsidiaries [18] to execute in 1929. Under that agreement the subsidiaries ceased all operating functions and the entire management, operation and financing of the business and properties of the subsidiaries were undertaken by Consolidated. The corporate existence of the subsidiaries, however, was maintained and certain separate accounts were kept. Under this agreement Consolidated undertook, *inter alia,* to pay the subsidiaries the amounts necessary for the interest and sinking fund provisions of the indentures and to credit their current accounts with items of depreciation, depletion, amortization and obsolescence.[19] Upon termination of the agreement the properties were to be returned and a final settlement of accounts made, Consolidated meanwhile to retain all net revenues after its obligations thereunder to the subsidiaries had been met. It was specifically provided that the agreement was made for the benefit of the parties, not "for the benefit of any third person." Consolidated's

---

[18] This agreement covered the properties of Reliance as well as Union and Consumers. By a modification made in 1933 the agreement was to expire in February, 1938, Consolidated having an option to extend the agreement for another five years on specified notice.

[19] The agreement was modified in 1933 (by two officers acting for each of the four companies) whereby the depreciation to be credited to the subsidiaries should be credited only on termination of the agreement. At that time Consolidated was to have the right, by paying a five per cent penalty, to pay twenty-five per cent of the amount of the depreciation credit in ten annual installments and the balance at the end of ten years from the date of termination. Some question has been raised as to the propriety of that modification, a question on which we express no opinion.

books as at June 30, 1938, showed a net indebtedness under that agreement to Union and Consumers of somewhat over $5,000,000. That claim was cancelled by the plan of reorganization, no securities being issued to the creditors of the subsidiaries therefor. The District Court made no findings as respects the amount or validity of that intercompany claim; it summarily disposed of it by concluding that any liability under the operating agreement was "not made for the benefit of any third parties and the bondholders are included in that category."

We agree with the Circuit Court of Appeals that it was error to confirm this plan of reorganization.

I. On this record no determination of the fairness of any plan of reorganization could be made. Absent the requisite valuation data, the court was in no position to exercise the "informed, independent judgment" (*National Surety Co.* v. *Coriell,* 289 U. S. 426, 436) which appraisal of the fairness of a plan of reorganization entails. *Case* v. *Los Angeles Lumber Products Co.,* 308 U. S. 106. And see *First National Bank* v. *Flershem,* 290 U. S. 504, 525. There are two aspects of that valuation problem.

In the first place, there must be a determination of what assets are subject to the payment of the respective claims. This obvious requirement was not met. The status of the Union and Consumers bondholders emphasizes its necessity and importance. According to the District Court the mortgaged assets are insufficient to pay the mortgage debt. There is no finding, however, as to the extent of the deficiency or the amount of unmortgaged assets and their value. It is plain that the bondholders would have, as against Consolidated and its stockholders, prior recourse against any unmortgaged assets of Union and Consumers. The full and absolute priority rule of *Northern Pacific Ry. Co.* v. *Boyd,* 228

U. S. 482, and *Case* v. *Los Angeles Lumber Products Co.,* *supra,* would preclude participation by the equity interests in any of those assets until the bondholders had been made whole. Here there are some unmortgaged assets, for there is a claim of Union and Consumers against Consolidated—a claim which according to the books of Consolidated is over $5,000,000 in amount. If that claim is valid,[20] or even if it were allowed only to the extent of 25% of its face amount,[21] then the entire assets of Consolidated would be drawn down into the estates of the subsidiaries. In that event Union and Consumers might or might not be solvent in the bankruptcy sense. But certainly it would render untenable the present contention of Consolidated and the preferred stockholders that they are contributing all of the assets of the Consolidated to the new company in exchange for which they are entitled to new securities. On that theory of the case they would be making a contribution of only such assets of Consolidated, if any, as remained after any deficiency of the bondholders had been wholly satisfied.

There are no barriers to a valuation and enforcement of that claim. If as Consolidated maintains the subsidiaries have no present claim against it,[22] the claim

[20] Consolidated seems to admit that that claim is valid, at least to the extent of net current liabilities aggregating more than $250,000 as of June 30, 1938.

[21] Respondent points out that even on the basis of a $3,300,000 valuation of the properties of Union and Consumers depreciation, depletion and obsolescence charges would be approximately $1,250,000.

[22] Consolidated maintains that there is no present claim against it because no claim exists until termination of the operating agreement which ran until February 1938, with an option in Consolidated to extend it for five years. But it does not assert, nor does the record show, that the option was exercised. But even if it had been,

can readily be discounted to present worth. It is provable by trustees of the subsidiaries, for the term "creditors" under § 77B (b) includes "holders of claims of whatever character against the debtor or its property, including claims under executory contracts, whether or not such claims would otherwise constitute provable claims under this Act." [23] Consolidated makes some point of the difficulty and expense of determining the extent of its liability under the operating agreement and of the necessity to abide by the technical terms of that agreement [24] in ascertaining that liability. But equity will not permit a holding company, which has dominated and controlled its subsidiaries, to escape or reduce its liability to those subsidiaries by reliance upon self-serving contracts which it has imposed on them. A holding company, as well as others in dominating or controlling positions (*Pepper* v. *Litton,* 308 U. S. 295), has fiduciary duties to security holders of its system which will be strictly enforced. See *Taylor* v. *Standard Gas & Electric Co.,* 306 U. S. 307. In this connection Consolidated cannot defeat or postpone the accounting because of the clause in the operating agreement that it was not made for the benefit of any third person. The question here is not a technical one as to who may sue to enforce that liability. It is merely a question as to the amount by which Consolidated is indebted to the

only the time when the amounts accrued were payable would be affected.

[23] For an equally broad definition of "creditor" under Ch. X of the Chandler Act (52 Stat. 840) see § 106 (1) and (4).

[24] Thus Consolidated argues that under the operating agreement the machinery for an appraisal provided therein must be employed. Yet assuming *arguendo* that that is true, Consolidated which has been in possession and control throughout cannot rely on the failure to have an appraisal as a reason for blocking or delaying its duty to account.

subsidiaries and the proof and allowance of that claim. The subsidiaries need not be sent into state courts to have that liability determined. The bankruptcy court having exclusive jurisdiction over the holding company and the subsidiaries has plenary power to adjudicate all the issues pertaining to the claim. The intimations of Consolidated that there must be foreclosure proceedings and protracted litigation in state courts involve a misconception of the duties and powers of the bankruptcy court. The fact that Consolidated might have a strategic or nuisance value outside of § 77B does not detract from or impair the power and duty of the bankruptcy court to require a full accounting as a condition precedent to approval of any plan of reorganization. The fact that the claim might be settled, with the approval of the Court after full disclosure and notice to interested parties, does not justify the concealed compromise effected here through the simple expedient of extinguishing the claim.

So far as the ability of the bondholders of Union and Consumers to reach the assets of Consolidated on claims of the kind covered by the operation agreement is concerned, there is another and more direct route which reaches the same end. There has been a unified operation of those several properties by Consolidated pursuant to the operating agreement. That operation not only resulted in extensive commingling of assets. All management functions of the several companies were assumed by Consolidated. The subsidiaries abdicated. Consolidated operated them as mere departments of its own business. Not even the formalities of separate corporate organizations were observed, except in minor particulars such as the maintenance of certain separate accounts. In view of these facts, Consolidated is in no position to claim that its assets are insulated from such

claims of creditors of the subsidiaries. To the contrary, it is well settled that where a holding company directly intervenes in the management of its subsidiaries so as to treat them as mere departments of its own enterprise, it is responsible for the obligations of those subsidiaries incurred or arising during its management. *Davis v. Alexander,* 269 U. S. 114, 117; *Joseph R. Foard Co. v. Maryland,* 219 F. 827, 829; *Stark Electric R. Co. v. M'Ginty Contracting Co.,* 238 F. 657, 661–663; *The Willem Van Driel, Sr.,* 252 F. 35, 37–39; *Luckenbach S. S. Co. v. W. R. Grace & Co.,* 267 F. 676, 681; *Costan v. Manila Electric Co.,* 24 F. 2d 383; *Kingston Dry Dock Co. v. Lake Champlain Transp. Co.,* 31 F. 2d 265, 267; *Dillard & Coffin Co. v. Richmond Cotton Oil Co.,* 140 Tenn. 290; 204 S. W. 758. We are not dealing here with a situation where other creditors of a parent company are competing with creditors of its subsidiaries. If meticulous regard to corporate forms, which Consolidated has long ignored, is now observed, the stockholders of Consolidated may be the direct beneficiaries. Equity will not countenance such a result. A holding company which assumes to treat the properties of its subsidiaries as its own cannot take the benefits of direct management without the burdens.

We have already noted that no adequate finding was made as to the value of the assets of Consolidated. In view of what we have said, it is apparent that a determination of that value must be made so that criteria will be available to determine an appropriate allocation of new securities between bondholders and stockholders in case there is an equity remaining after the bondholders have been made whole.

There is another reason why the failure to ascertain what assets are subject to the payment of the Union and Consumers bonds is fatal. There is a question raised as to the fairness of the plan as respects the bondholders

*inter sese.* While the total mortgage debt of Consumers is less than that of Union, the net income of the new company, as we have seen,[25] is to be divided into two equal parts, one to service the new securities issued to Consumers bondholders, the other to service those issued to Union bondholders. That allocation is attacked here by respondent as discriminatory against Union, on the ground that the assets of Union are much greater in volume and in value than those of Consumers. It does not appear from this record that Union and Consumers have individual earnings records. If they do not, some appropriate formula for at least an approximate ascertainment of their respective assets must be designed in spite of the difficulties occasioned by the commingling. Otherwise the issue of fairness of any plan of reorganization as between Union and Consumers bondholders cannot be intelligently resolved.

In the second place, there is the question of the method of valuation. From this record it is apparent that little, if any, effort was made to value the whole enterprise by a capitalization of prospective earnings. The necessity for such an inquiry is emphasized by the poor earnings record of this enterprise in the past. Findings as to the earning capacity of an enterprise are essential to a determination of the feasibility as well as the fairness of a plan of reorganization. Whether or not the earnings may reasonably be expected to meet the interest and dividend requirements of the new securities is a *sine qua non* to a determination of the integrity and practicability of the new capital structure. It is also essential for satisfaction of the absolute priority rule of *Case* v. *Los Angeles Lumber Products Co., supra.* Unless meticulous regard for earning capacity be had, indefensible

---

[25] *Supra,* note 10.

participation of junior securities in plans of reorganization may result.

As Mr. Justice Holmes said in *Galveston, H. & S. A. Ry. Co.* v. *Texas,* 210 U. S. 217, 226, "the commercial value of property consists in the expectation of income from it." And see *Cleveland, C., C. & St. L. Ry. Co.* v. *Backus,* 154 U. S. 439, 445. Such criterion is the appropriate one here, since we are dealing with the issue of solvency arising in connection with reorganization plans involving productive properties. It is plain that valuations for other purposes are not relevant to or helpful in a determination of that issue, except as they may indirectly bear on earning capacity. *Temmer* v. *Denver Tramway Co.,* 18 F. 2d 226, 229; *New York Trust Co.* v. *Continental & Commercial Trust & Sav. Bank,* 26 F. 2d 872, 874. The criterion of earning capacity is the essential one if the enterprise is to be freed from the heavy hand of past errors, miscalculations or disaster, and if the allocation of securities among the various claimants is to be fair and equitable. *In re Wickwire Spencer Steel Co.,* 12 F. Supp. 528, 533; 2 Bonbright, Valuation of Property, pp. 870–881, 884–893. Since its application requires a prediction as to what will occur in the future, an estimate, as distinguished from mathematical certitude, is all that can be made. But that estimate must be based on an informed judgment which embraces all facts relevant to future earning capacity and hence to present worth, including, of course, the nature and condition of the properties, the past earnings record, and all circumstances which indicate whether or not that record is a reliable criterion of future performance. A sum of values based on physical factors and assigned to separate units of the property without regard to the earning capacity of the whole enterprise is plainly inadequate. See Finletter, The Law of Bankruptcy Reorganization, pp. 557 *et seq.* But hardly more than that was done here.

The Circuit Court of Appeals correctly left the matter of a formal appraisal to the discretion of the District Court. The extent and method of inquiry necessary for a valuation based on earning capacity are necessarily dependent on the facts of each case.

II. The Circuit Court of Appeals held that the absolute priority rule of *Northern Pacific Ry. Co.* v. *Boyd, supra,* and *Case* v. *Los Angeles Lumber Products Co., supra,* applied to reorganizations of solvent as well as insolvent companies. That is true. Whether a company is solvent or insolvent in either the equity or the bankruptcy sense, "any arrangement of the parties by which the subordinate rights and interests of the stockholders are attempted to be secured at the expense of the prior rights" of creditors "comes within judicial denunciation." *Louisville Trust Co.* v. *Louisville, N. A. & C. Ry. Co.,* 174 U. S. 674, 684. And we indicated in *Case* v. *Los Angeles Lumber Products Co., supra,* that that rule was not satisfied even though the "relative priorities" of creditors and stockholders were maintained (pp. 119–120).

The instant plan runs afoul of that principle. In the first place, no provision is made for the accrued interest on the bonds. This interest is entitled to the same priority as the principal. See *American Iron & Steel Mfg. Co.* v. *Seaboard Air Line Ry.,* 233 U. S. 261, 266–267; *Ticonic National Bank* v. *Sprague,* 303 U. S. 406. In the second place, and apart from the cancellation of interest, the plan does not satisfy the fixed principle of the *Boyd* case even on the assumption that the enterprise as a whole is solvent in the bankruptcy sense. The bondholders for the principal amount of their 6% bonds receive an equal face amount of new 5% income bonds and preferred stock, while the preferred stockholders receive new common stock. True, the relative priorities are maintained. But the bondholders have not been

made whole. They have received an inferior grade of securities, inferior in the sense that the interest rate has been reduced, a contingent return has been substituted for a fixed one, the maturities have been in part extended and in part eliminated by the substitution of preferred stock, and their former strategic position has been weakened. Those lost rights are of value. Full compensatory provision must be made for the entire bundle of rights which the creditors surrender.

The absolute priority rule does not mean that bondholders cannot be given inferior grades of securities, or even securities of the same grade as are received by junior interests. Requirements of feasibility [26] of reorganization plans frequently necessitate it in the interests of simpler and more conservative capital structures. And standards of fairness permit it. This was recognized in *Kansas City Terminal Ry. Co.* v. *Central Union Trust Co.*, 271 U. S. 445. This Court there said (p. 455) that though "to the extent of their debts creditors are entitled to priority over stockholders against all the property" of the debtor company, "it does not follow that in every reorganization the securities offered to general creditors must be superior in rank or grade to any which stockholders may obtain. It is not impossible to accord to the creditor his superior rights in other ways." And the Court went on to say (p. 456), "No offer is fair which does not recognize the prior rights of creditors . . .; but circumstances may justify an offer of different amounts of the same grade of securities to both creditors and stockholders." Thus it is plain that while creditors may be given inferior grades of securities, their "superior rights" must be recognized. Clearly, those prior rights are not recognized, in cases where stockholders are participating in the plan, if creditors are

---

[26] § 77B (f) (1).

given only a face amount of inferior securities equal to the face amount of their claims. They must receive, in addition, compensation for the senior rights which they are to surrender. If they receive less than that full compensatory treatment, some of their property rights will be appropriated for the benefit of stockholders without compensation. That is not permissible. The plan then comes within judicial denunciation because it does not recognize the creditors' "equitable right to be preferred to stockholders against the full value of all property belonging to the debtor corporation." *Kansas City Terminal Ry. Co.* v. *Central Union Trust Co., supra,* p. 454.

Practical adjustments, rather than a rigid formula, are necessary. The method of effecting full compensation for senior claimants will vary from case to case. As indicated in the *Boyd* case (228 U. S. at p. 508) the creditors are entitled to have the full value of the property, whether "present or prospective, for dividends or only for purposes of control," first appropriated to payment of their claims. But whether in case of a solvent company the creditors should be made whole for the change in or loss of their seniority by an increased participation in assets, in earnings or in control, or in any combination thereof, will be dependent on the facts and requirements of each case.[27] So long as the new securities offered are

---

[27] In view of the condition of the record relative to the value of the properties and the fact that the accrued interest is cancelled by the plan, it is not profitable to attempt a detailed discussion of the deficiencies in the alleged compensatory treatment of the bondholders. It should, however, be noted as respects the warrants issued to the old common stockholders that they admittedly have no equity in the enterprise. Accordingly, it should have been shown that there was a necessity of seeking new money from them and that the participation accorded them was not more than reasonably equivalent to their contribution. *Kansas City Terminal Ry. Co.* v.

of a value equal to the creditors' claims, the appropriateness of the formula employed rests in the informed discretion of the court.

· The Circuit Court of Appeals, however, made certain statements which if taken literally do not comport with the requirements of the absolute priority rule. It apparently ruled that a class of claimants with a lien on specific properties must receive full compensation out of those properties, and that a plan of reorganization is *per se* unfair and inequitable if it substitutes for several old bond issues, separately secured, new securities constituting an interest in all of the properties. That does not follow from *Case v. Los Angeles Lumber Products Co., supra.* If the creditors are adequately compensated for the loss of their prior claims, it is not material out of what assets they are paid. So long as they receive full compensatory treatment and so long as each group shares in the securities of the whole enterprise on an equitable basis, the requirements of "fair and equitable" are satisfied.

Any other standard might well place insuperable obstacles in the way of feasible plans of reorganization. Certainly where unified operations of separate properties are deemed advisable and essential, as they were in this case, the elimination of divisional mortgages may be

---

*Central Union Trust Co., supra; Case v. Los Angeles Lumber Products Co., supra,* pp. 121–122. In the latter case we warned against the dilution of creditors' rights by inadequate contributions by stockholders. Here that dilution takes a rather obvious form in view of the lower price at which the stockholders may exercise the warrants. Warrants exercised by them would dilute the value of common stock purchased by bondholders during the same period. Furthermore, on Consolidated's estimate of the equity in the enterprise, the values of the new common would have to increase many fold to reach a value which exceeds the warrant price by the amount of the accrued interest.

necessary as well as wise. Moreover, the substitution of a simple, conservative capital structure for a highly complicated one may be a primary requirement of any reorganization plan. There is no necessity to construct the new capital structure on the framework of the old.

*Affirmed.*