**In re NEW ENGLAND POWER ASS'N et al.**
**Civil Action No. 5087.**

District Court, D. Massachusetts.
June 7, 1946.

Harry G. Slater, Sp. Counsel Public Utilities Division, of Philadelphia, Pa., and Bernard S. Kanton, of New Yok City, for applicant Securities and Exchange Commission.

John A. Lyons and Lawrence Black, both of Boston, Mass., for Charles H. Tenney et al.

Winthrop, Stimson, Putnam & Roberts, of New York City, and Hinckley, Allen, Tillinghast & Wheeler, of Providence, R. I., for the Committee representing the $2 Preferred Stockholders of Rhode Island Public Service Co.

John R. Quarles and Ropes, Gray, Best, Coolidge & Rugg, all of Boston, Mass., for New England Power Ass'n, Massachusetts Power & Light Associates, North Boston Lighting Properties, Rhode Island Public Service Co., Massachusetts Utilities Associates, Common Voting Trust and Massachusetts Utilities Associates.

Arthur E. Whittemore, of Boston, Mass., for Matthew Lahti.

Leeds A. Wheeler, of Boston, Mass., for New England Power Ass'n, Massachusetts Power & Light Associates, North Boston Lighting Properties, Rhode Island Public Service Company, Massachusetts Utilities Associates Common Voting Trust, and Massachusetts Utilities Associates.

Frederick J. Dunn, of Boston, Mass., for N. E. Power Ass'n, Massachusetts Power & Light Associates, North Boston Lighting Properties, Rhode Island Public Service Company, Massachusetts Utilities Associates Common Voting Trust and Massachusetts Utilities Associates.

FORD, District Judge.

This matter is before the court on an application of the Securities and Exchange Commission pursuant to Section 11(e) of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79k(e), hereinafter referred to as the Act, to approve a plan of New England Power Association et al. as fair, equitable, and appropriate to effectuate the provisions of Section 11(b) of the Act.

New England Power Association (hereinafter sometimes referred to as "NEPA") is a voluntary association organized under the laws of the Commonwealth of Massachusetts, and is a holding company within the meaning of Section 2(a) (7) of the Act, 15 U.S.C.A. § 79b(a) (7). NEPA has filed notification of registration under Section 5(a) of the Act, 15 U.S.C.A. § 79e (a). NEPA is also a subsidiary of International Hydro-Electric System, a holding company within the meaning of Section 2 (a) (7) of the Act, now in the process of liquidation and controlling 51.5% of the total voting power of NEPA.

The subsidiaries of NEPA within the meaning of Section 2(a) (8) of the Act are as follows: Massachusetts Power and Light Associates (hereinafter referred to as "MP&L"), a voluntary association organized under Massachusetts laws and a holding company under Section 2(a) (7) of the Act; North Boston Lighting Properties (hereinafter sometimes referred to as "NOBO"), a voluntary association under Massachusetts laws, a holding company within the meaning of Section 2(a) (7) of the Act and a subsidiary of MP&L; the Rhode Island Public Service Company (hereinafter sometimes referred to as "RIPS"), a corporation organized under the laws of Rhode Island, a holding company within the meaning of the Act; Massachusetts Utilities Associates Common Voting Trust (hereinafter sometimes referred to as "MUA Trust"), a voluntary association organized under Massachusetts laws and a holding company within the meaning of the Act; Massachusetts Utilities Associates (hereinafter sometimes referred to as "MUA") organized under Massachusetts laws and a holding company within the meaning of the Act and a subsidiary of MUA Trust.

NEPA controls, directly and indirectly, through its subsidiary holding companies, namely, MP&L, NOBO, RIPS, MUA Trust, and MUA, forty-two electric and gas utility companies (within the meaning of Section 2(a) (3) and 2(a) (4) of the Act) and nine non-utility companies

operating within the states of Vermont, New Hampshire, Massachusetts, Rhode Island, and a small section of southeastern Connecticut.

NEPA and its subsidiary holding companies had outstanding on December 31, 1944, in the aggregate eighteen different classes of securities as follows:

NOBO

| | |
|---|---|
| $12,687,350 | debt to bank |
| 228,080 | Preferred shares |
| 433,354 | Common shares |

MP&L

| | |
|---|---|
| 1,271,134 | $2 Preferred shares |
| 297,462 | $2 2nd Preferred shares |
| 1,742,617 | Common shares |

RIPS

| | |
|---|---|
| 495,726 | Preferred shares |
| 80,735 | Class A shares |
| 2,268,167 | Class B shares |

MUA Trust

| | |
|---|---|
| 1,875,000 | Voting Trust Certificates |

MUA

| | |
|---|---|
| $ 3,000,000 | debt to bank |
| 579,090 | Preferred shares |
| 1,875,000 | Common shares |

NEPA

| | |
|---|---|
| $21,619,000 | 5% Debentures, due 1948 |
| 23,081,500 | 5½% Debentures, due 1954 |
| 656,457 | 6% Preferred shares |
| 19,388 | $2 Dividend Preferred shares |
| 932,604 | Common shares. |

On March 17, 1943, the Commission after notice and opportunity for hearing issued its Findings and Opinion and Order * (Section 11(b) (2) directed to NEPA and its subsidiaries wherein it was held that the continued existence of MP&L, NOBO, RIPS, MUA Trust, and MUA as holding companies in the NEPA holding company system, unduly and unnecessarily complicate the structure and unfairly and inequitably distribute voting power among security holders of the NEPA holding company system. The order of March 17, 1943, required that MP&L, NOBO, RIPS, and MUA be eliminated as holding companies in the NEPA holding company system and that MUA Trust be liquidated and dissolved, "to the end that the system shall contain only one public utility holding company (which is not at present also a public utility company)."

In order to comply with the provisions of Section 11(b) (2) of the Act and the order of March 17, 1943, NEPA and its subsidiary holding companies filed a joint application, pursuant to Section 11(e) of the Act, for approval of a plan of simplification on March 6, 1944. The original plan dated March 1, 1944, was amended June 21, 1945, August 11, 1945, and November 5, 1945, by NEPA and its subsidiary holding companies.

On March 14, 1946, after proper notice and various public hearings, the Commission entered its Findings and Opinion and Order, finding the amended plan necessary to effectuate the provisions of Section 11 (b) and fair and equitable to the persons affected by it and approving the plan.

The amended plan is now here on application for approval by this Court.

Generally, the plan as finally amended, and approved by the Commission, provides for the liquidation and termination of the MUA Trust and the substitution of a single holding company for NEPA and its other subsidiary holding companies to be known as New England Electric System, hereinafter referred to as "NEES." After consummation of the plan the corporate structure of the NEPA holding company system will consist of one holding company with forty-two operating utilities and nine non-utility subsidiaries. NEES will be a Massachusetts voluntary association, registered under the Act, and will hold all of the assets of the existing holding companies, subject to their liabilities. Under the plan there will be two classes of securities instead of the eighteen now outstanding. These securities under the plan will consist of $85,000,000 principal amount of long term debt securities, to be issued and sold at competitive bidding, and

---

* Order final, no petition for review filed. C.A. §§ 79k (c( 79x.  Sections 11 (c) and 24 of the Act, 15 U.S.

6,695,075 common shares of NEES having a par value of $20 per share. The proceeds of the debt securities are to be used in part for the discharge of approximately $60,700,000 of the existing debt obligations of NEPA (its 5% and 5½% debentures) and outstanding bank loans of NOBO and MUA. The common shares together with cash (from balance left after paying off debt obligations with additional cash from company's treasury) in certain instances are to be distributed to the various public stockholders.

The distribution of the new common shares and cash proposed to be made under the amended plans to the various public stockholders of the NEPA and its subsidiary holding companies is as follows:

Section 11(b), and we therefore find it is necessary to effectuate the provisions of that Section." Cf. In re North Continent Utilities Corp., D.C., 54 F.Supp. 527, 530. The subsidiary findings and ultimate finding made by the Commission with respect to this requirement demanded by Section 11(e) of the Act are accepted by the court since it appears the findings are based on substantial evidence.

This brings us to a consideration of the remaining requirement of Section 11(e) of the Act, i. e., is the plan fair and equitable to all persons affected by it?

Objections on the ground that the plan is not fair and equitable have been filed and argued by counsel for eight holders of a small fraction of the outstanding MP&L

#### MP&L

| | |
|---|---|
| For each $2 Preferred share | $8 annd 1 1/10 shares |
| For each $2 Second Preferred share | 3/100 of a share |
| For each Common share | 1/100 of a share |

#### NOBO

| | |
|---|---|
| For each Preferred share | $36 and 1 share |
| For each Common share | 2 shares |

#### RIPS

| | |
|---|---|
| For each Preferred share | $16.50 and 1 share |
| For each Class A share | 3 3/4 shares |

#### MUA

| | |
|---|---|
| For each Preferred share | $16.50 and 1½ shares |
| For each Common share | 15/100 of a share |

#### NEPA

| | |
|---|---|
| For each 6% Preferred share | 5 4/10 shares |
| For each $2 dividend preferred share | 1 8/10 shares |
| For each Common share | 65/100 of a share |

■ It is clear the results accomplished by the plan, i. e., the elimination of the holding companies, the reduction of their eighteen securities to two, the improvement in existing overcapitalized structure, the result of redistribution of voting power among security holders of the system, warranted the Commission's subsidiary findings and its ultimate finding that the amended plan "provides an appropriate means of accomplishing many of the steps contemplated under

and NOBO preferred shares. The total number of shareholders in the NEPA system exceeds 50,000. Counsel for a RIPS preferred stockholders' committee, representing also a very small fraction of the total outstanding shares, filed no brief in this court but appeared, argued, and finally stated they would withdraw their objections in the event of a reasonably prompt order confirming the plan from which no appeal was taken.

382

The first plan in this proceeding was substituted early in 1944; public hearings began May 3, 1944; and final approval was given by the Commission March 14, 1946.

The objections made in this court to the plan were presented before the Commission in protracted public hearings and after consideration of substantially all the important contentions made here, were found to be without merit.

In analyzing the various allocations proposed in the amended plan, the Commission considered in detail all data that was presented, especially with respect to the underlying assets being surrendered and received. The fairness of each allocation in addition to being based on asset value was also based, in a great part, upon an analysis of the earnings prospects of each presently outstanding security as compared with the prospective earnings allocated to the holders of such security in the event the plan was consummated in an attempt to apply the principle of full compensatory treatment represented by a share in the securities of the whole enterprise on an equitable basis. This earnings test was most important. Cf. Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 526, 530, 61 S.Ct. 675, 85 L.Ed. 982. The Commission used two earnings levels to test the proposed allocations, namely, the seven-year average adjusted earnings level where the earnings per share of NEES common stockholders were about $1.45 per share and the postwar normal year where the earnings per share of NEES common stock were estimated at about $1.59 a share. The commission, in determining the equitable equivalent of the security being surrendered, gave extended consideration "to the entire set of rights and limitations of the security in the business context of the issues, apart from the impact of Section 11."

## Conclusion.

In the Commission's Findings and Opinion will be found the extensive data, tables, and the detailed account of the treatment by the Commission of each security. It would serve no useful purpose to set these matters out here. The only purpose served would be to reiterate what the Commission has already set out in its Opinion and Findings. The Commission, after according the matter its expert attention, recorded its subsidiary findings of fact and reached the ultimate conclusion that the amended plan was "fair and equitable to the persons affected by it."

This court has reviewed the Opinion and Findings of the Commission and is convinced that the findings made by that expert body are supported by substantial evidence and its conclusion that the amended plan is fair and equitable is amply supported by these findings.

In truth, any court charged with a review of the findings of the Securities and Exchange Commission, in a matter so complex in its nature as is the present proceeding, should accept the findings of the expert body unless it concludes that an error of law has been committed or the findings are of an arbitrary or capricious nature. I find no error of law nor do I find any aspect of arbitrariness in the Commission's findings.

The plan is approved as fair and equitable and as appropriate to effectuate the provisions of Section 11 of the Act, and an order may be presented to carry out the terms and provisions of the plan.