## In re KEESHIN FREIGHT LINES, Inc. et al.

### No. 46 B 26.

United States District Court
N. D. Illinois, E. D.
Sept. 26, 1949.

Manuel E. Cowen, Chicago, Ill., for trustees.

Hinshaw & Culbertson, Chicago, Ill., for American Reinsurance.

I. Harvey Levinson, Chicago, Ill., for D. D. Walker.

Gottlieb, Schwartz & Friedman, Chicago, Ill., for Keeshin Freight Lines, Inc. Ryan, Condon & Livingston, Chicago, Ill., for American Fidelity & Casualty Co., Inc.

Barrett, Barrett, Costello & Barrett, Chicago, Ill., for Socony-Vacuum Oil Co. et al.

Lord, Bissell & Kadyk and Russell Greenacre, Chicago, Ill., for St. Paul Fire & Marine Ins. Co.

Mooris Sider, Chicago, Ill., claimant (for himself).

Bohrer, Blackman & Loman, Chicago, Ill., for Fruehauf Trailer Co.

Helen W. Munsert, Chicago, Ill., for Keeshin and Estate of L. M. Walters.

Erich W. Lademann, Chicago, Ill., for Baltimore & Ohio.

Kirkland, Fleming, Green, Martin & Ellis, Chicago, Ill., for American Nat. Bank & Trust Co., Chicago.

Pope & Ballard, Chicago, Ill., for General Motors.

Rooks & Freeman, Chicago, Ill., for Keeskin & Ratner.

Haight, Goldstein & Hobbs, Chicago, Ill., for Esso Standard Oil.

Raymond L. McClory, Chicago Ill., for Seaboard Surety.

Securities & Exchange Commission, Chicago, Ill., for debtors.

LA BUY, District Judge.

On April 14, 1949, two amended plans of reorganization were filed before the court. One is the Trustees' Alternate Plan, known as the Walker Plan, which provides for a sale of the assets at not less than a fair upset price to be fixed by the court. As part of said plan, D. D. Walker and associates guarantee to make a minimum cash bid of $1,410,000. That plan provides, upon approval by the court of the sale under said plan, that if the Walker group was the highest bidder at the sale, they would pay the sum of $1,410,000 in cash and the entire amount received under said sale would be used for the payment of priorities and of general creditors, in the order of priority to be determined by the court. The said plan also provides for the assumption by purchasers of all unpaid obligations incurred by the trustees, including equipment obligations. The said plan also contains an estimated table of distribution, which is supplemented by figures testified to by the comptroller of the company, from which it appears that his estimate of taxes due the United States Government would be reduced about $50,000. By said plan, it was originally estimated that general claims

would amount to approximately $946,000 and that there would be available some $750,000 for the payment of said claims. Since the estimate of taxes due the Government has been reduced, it now appears that approximately $800,000 will be available for payment of claims under this plan. Therefore, under the Trustees' Alternate Plan, it appears that priority creditors would be paid in full and in cash and that general creditors of the operating companies, taken as a whole, would receive approximately 85¢ in cash for each $1 of estimated claims. The bid of $1,410,000 was reduced to $1,335,000 because of the payment of some $75,000 in C. O. D. claims incurred prior to trusteeship, pursuant to order of court. The estimated distribution to general creditors, however, remains the same.

The second plan before the court is the Keeshin-Ratner Plan. This plan, in brief, provides that the proponents, J. L. Keeshin, who was the operating head of the Keeshin System until three months prior to the filing of the petition for reorganization herein, and Mr. David H. Ratner, would jointly pay $600,000 to be used by them for the purchase of $300,000 preferred stock and $300,000 common stock in a new company. The $600,000 would be used as follows: The payment of approximately one-third of the taxes due the United States plus the full amount due the state governments, the total of which is estimated as being approximately $130,000 (this might be reduced to approximately $103,000 because of a reduction in taxes due the United States as hereinbefore stated). It is estimated this would leave approximately $220,000 in unpaid United States taxes, for which proponents were to give notes payable quarterly over a two-year period with interest at 6% per annum, personally secured by signatures of said proponents (because of the amended estimates of the comptroller, it appears that the balance of these taxes due the United States would be approximately $147,000). It also proposes to pay 30% in cash to an estimated $750,-000 of general creditors of the operating companies who had not agreed to subordinate their claims. It is estimated in said plan that this payment would require about

$220,000 of the cash proposed to be paid into the new company by the proponents. By Exhibit No. 11, introduced by the proponents, it appears the total payments to be made out of $600,000, to cover the aforesaid taxes, prior liens and general creditors, is the sum of $473,000. The said plan also provides that the remaining general creditors who had agreed to subordinate their claims would receive junior notes, payment on said notes to be at the end of the fifth year and to be retired by the end of the eighth year. Proponents also propose to give to creditors of the parent, or holding company, 15% of the face value of their notes. The total of serial notes outstanding were approximately $1,954,000 and therefore would mean the issuance of approximately $293,000 in second preferred stock which was not redeemable until after all the serial notes and junior notes were paid in full. No dividends were guaranteed and the holders were only entitled to receive dividends of 3% of the par value per annum, when and if declared by the Board of Directors. The junior notes were later eliminated and those creditors who agreed thereto were to receive second preferred stock.

On June 24, 1949, after lengthy hearings held before this court involving the taking of approximately fifteen hundred pages of testimony, the court found that both of said plans were worthy of consideration and referred the same to the Securities and Exchange Commission for its advisory report.

On August 8, 1949 the S.E.C. filed its advisory report in this court which, in essence, finds that the valuation of the enterprise is approximately $2,200,000 and finds that both the Trustees' Alternate Plan and the Keeshin-Ratner Plan are unfair to creditors. Said advisory report also finds that the Keeshin-Ratner plan is only "narrowly feasible" Said report finds that the Trustees all cash plan or Alternate Plan is feasible but that the cash proposed to be paid as a minimum bid under said plan is inadequate because of the valuation findings made by the commission in its advisory report. On August 23rd, the said matter was argued before the court upon the hearing on approval of plans. Also on that

date, the Keeshin-Ratner proponents filed an amendment to their plan, which provided that the junior notes should be eliminated and those creditors who agreed thereto would receive second preferred stock in the same amount as their claims.

The court is of the opinion that its first consideration is to arrive at the fair value of the enterprise. Unless this is done, it will be impossible to ascertain the extent to which creditors shall be entitled to participate in any plan to be approved by the court.

■ A plan is not fair and equitable unless it provides participation for claims and interests in complete recognition of their strict priorities, and unless the value of the debtor's assets supports the extent of the participation afforded each class of claims or interests included in the plan. Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982; Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110.

In arriving at the enterprise value, the Supreme Court of the United States has held that the basic question is "how much the enterprise in all probability can earn." Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & P. R. Co., 318 U.S. 523, 540, 63 S.Ct. 727, 738, 87 L.Ed. 959. Only a meticulous regard for the earning capacity can afford the old security holders protection against a dilution of their priorities and can give the new company some safeguards against the scourge of overcapitalization. Group of Institutional Investors, supra, 318 U.S. at page 541, 63 S.Ct. at page 738, citing Consolidated Rock Products Co. v. DuBois, supra, 312 U.S. at page 525, 61 S.Ct. at pages 684, 685.

In estimating the enterprise value of the Keeshin System, the principal witness who attempted to estimate what the future normal earnings of the reorganized company would be, was Dr. Badger. He estimated that the company would earn approximately $500,000 per year before taxes, and approximately $310,000 per year after taxes. All the other witnesses adopted this figure. Dr. Dorau, testifying for the Keeshin-Ratner plan, made no independent research on the question of earnings, but stated that he agreed with Dr. Badger.

The Securities and Exchange Commission also adopted Dr. Badger's estimate. Dr. Badger, in his testimony, stated that he made his estimate primarily by taking two years; the years 1941 and 1948. In this Dr. Badger's basic assumption was in error. The exhibits introduced in evidence show that the company had a large amount of new equipment on hand in 1941. Naturally, the use of new equipment will result in much smaller maintenance charges than is ordinarily the case. This is illustrated by the maintenance chart set forth in the trustees' memorandum, taken from the books and records in their hands, showing the maintenance for the years between 1936 and 1949, inclusive, from which it appears that the average maintenance charges were 14.06% per year, whereas, 1941 showed maintenance charges of 9.29%. The net carrier operating revenue in 1941 was therefore unduly high because of these low maintenance charges.

Likewise, the year 1948 showed net carrier operating revenue before interest or taxes of over $500,000. In 1948 the trustees obtained approximately a 10% increase in rates, which they enjoyed for four months before they incurred a corresponding increase in wages. The rate increase was effective July 15, 1948 and the wage increases did not come into effect until November 15, 1948. The petition in this cause was filed more than three years ago and during this period the trustees have made monthly reports to the court and numerous petitions and orders were considered by the court. It is the opinion of the court that the trustees managed the business competently and efficiently, but nevertheless the four months lag referred to during which the company enjoyed a rate increase before wage increases accounted for a considerable portion of the profits in 1948.

It appears that 1941 and 1948 were, therefore, unusual years, involving circumstances which were distinctly out of the ordinary, and there is no proof that the circumstances under which those earnings were produced were ever repeated during the other past years of the company's history. However, even if 1941 and 1948 were not abnormal years, it was erroneous on the part of the witness to single out the two years of highest earnings and rely exclu-

sively on them in estimating future earnings expectancies. The record does not disclose any logical reason why only the two highest years should have been used. Certainly, a more proper and reliable estimate of future earnings expectancies that can reasonably be expected to be produced would have been to take into consideration all of the other years in the company's past history.

■ It is proper to examine the past earnings history of a business in considering whether or not a future earnings estimate is reasonable. The federal courts have recognized the desirability of taking a number of years of past earnings into consideration in arriving at a reasonable estimate of the future earnings capacity of an enterprise. In Dudley v. Mealey, 2 Cir., 1945, 147 F.2d 268, the court, through Judge Learned Hand, approved of taking either five or eleven years. In Re Barlum Realty Co., D.C.Mich.1945, 62 F.Supp. 81, a fifteen year period was approved.

Disregarding the years 1936 and 1937, which were the formative years during which the company lost nearly $1,000,000 each year, and averaging the earnings for the eleven years from 1938 to 1948, inclusive, produces an average earnings of $94,947 before taxes, and $58,744 after taxes, as contrasted with Dr. Badger's estimate of $500,000 before taxes and approximately $310,000 after taxes.

Another test of the reasonableness of the estimate would be to disregard the so-called formative years of 1936 and 1937 and to average the years 1938 to 1941, inclusive, eliminating the war years of 1942 to 1945, inclusive, and to take the years 1946, 1947 and 1948. This produces an average earnings of $176,868 before taxes and $109,000 after taxes, as compared with Dr. Badger's estimate of $500,000 before taxes and approximately $310,000 after taxes.

Testing Dr. Badger's estimate of future earnings by methods approved by the courts in valuation cases, in arriving at a reasonable estimate of earnings, the figure of $500,000 assumed by Dr. Badger and followed by all other witnesses is unreasonably high and is not justified from this record, or by applying to it any of the known tests or safeguards used by courts in testing opinions of earnings normally expected to be realized in the future.

■ The problem at arriving at a reasonable estimate of future earnings may also be examined from the standpoint of net carrier operating revenue, and the operating ratio derived therefrom. It is to be noted that Dr. Badger's estimate of $500,000 before taxes, was based upon a theoretical net operating profit of 5%, or, in other words, an operating ratio of 95%.

■ Inasmuch as Dr. Badger and other witnesses referred to operating ratios, it would be well to compute these ratios for the years between 1936 and 1949 in order to compare the actual ratios with Dr. Badger's estimate of 95% operating ratio. The computation discloses the following percentages:

| | Operating Ratio | Percentage of Profit | Percentage of Loss |
|---|---|---|---|
| 1936 | 117.08% | | 17.08% |
| 1937 | 111.56% | | 11.56% |
| 1938 | 104.39% | | 4.39% |
| 1938 | 98.54% | 1.46% | |
| 1940 | 99.59% | .41% | |
| 1941 | 93.09% | 6.91% | |
| 1942 | 95.91% | 4.09% | |
| 1943 | 99.70% | .30% | |
| 1944 | 99.67% | .33% | |
| 1945 | 107.13% | | 7.13% |
| January, 1946 | 123.49% | | 23.49% |
| Feb. 1 to Dec. 31, '46 | 99.56% | .44% | |
| 1947 | 99.63% | .37% | |
| 1948 | 94.38% | 5.62% | |
| Jan. 1 to July 31, '49 | 99.35% | .65% | |

Thus, it can be seen, that in only two years of some fourteen years of its existence did the Keeshin System equal or better a 95% operating ratio. Most other years were either deficit years or years of small profits, much less than the 5% predicted by Dr. Badger as normal. The record also indicates that in the first quarter of 1949 a substantial number of large trucking companies were not making a .5% profit and many are operating at a loss or at a small profit of 1% or 2%.

It was by the use of the two years of 1941 and 1948 that Dr. Badger arrived at his estimate of earnings. Dr. Badger capitalized the resultant figure of approximately $310,000 after taxes by six and reached a valuation of approximately $1,860,000. The Securities and Exchange capitalized the same earnings figure by 6⅔ and reached a valuation of $2,100,000 and by adding $100,000 in so-called "excess" working capital, reached a valuation of $2,200,000.

Both the trustees and the proponents of the Keeshin-Ratner plan criticize the value arrived at by the Securities and Exchange Commission on the ground that it is excessive. In this the court agrees. There is no justification in the record for the valuation arrived at by the S.E.C. It cannot fairly be stated to have been based upon the evidence. The witness Forrest testified to a value of approximately $1,250,000. Dr. Badger testified in 1948 that the long term enterprise value is $1,860,000. In 1949 Dr. Badger testified to a spot or current market value of $1,350,000. The proponents of the Keeshin-Ratner plan contend that a valuation of about $1,800,000 estimated by Dr. Badger in 1948 is more correct.

It is imperative, in the interest of a sound reorganization, that the new company be organized upon a proper valuation basis, one that will give it a reasonable chance of survival. Unless the court observes that "meticulous regard for earning capacity" which the decisions of the United States Supreme Court declare to be absolutely essential, the new company will have no chance of success.

In the case of In re Plankinton Bldg. Co., D.C.Wis.1941, 40 F.Supp. 517, 518, the court in discussing the questions to be considered in arriving at the valuation of a business quoted from the leading case of Consolidated Rock Products Co. v. DuBois, supra, as follows:

"In the second place, there is the question of the method of valuation. From this record it is apparent that little, if any, effort was made to value the whole enterprise by a capitalization of prospective earnings. The necessity for such an inquiry is emphasized by the poor earnings record of this enterprise in the past. Findings as to the earning capacity of an enterprise are essential to a determination of the feasibility as well as the fairness of a plan of reorganization. * * *

" * * * Such criterion is the appropriate one here, since we are dealing with the issue of solvency arising in connection with reorganization plans involving productive properties. It is plain that valuations for other purposes are not relevant to or helpful in a determination of that issue, except as they may indirectly bear on earning capacity. * * * The criterion of earning capacity is the essential one if the enterprise is to be freed from the heavy hand of past errors, miscalculations or disaster, and if the allocation of securities among the various claimants is to be fair and equitable. * * * Since its application requires a prediction as to what will occur in the future, an estimate, as distinguished from mathematical certitude, is all that can be made. But that estimate must be based on an informed judgment which embraces all facts relevent to future earning capacity and hence to present worth, including, of course, the nature and condition of the properties, the past earnings record, and all circumstances which indicate whether or not that record is a reliable criterion of future performance. * * * The extent and method of inquiry necessary for a valuation based on earning capacity are necessarily dependent on the facts of each case."

It is therefore necessary to use either a more reasonable earnings expectancy than the $500,000 used by Dr. Badger and the Securities and Exchange Commission in arriving at their valuation of this enterprise, or to use a lower price earnings multiplier

than the 6 and 6⅔ figures used in order to give proper consideration to the fact that these earnings have been overstated. Forrest testified that he used a price earnings multiplier of 4 in arriving at his estimate of the valuation of the enterprise. He also testified that such leading stocks as Chrysler and General Motors are selling on the market at five and six times earnings. It is reasonable to assume that if the stocks of such business concerns, with a very favorable and impressive past earnings record for many years, are selling on a basis of five or six times earnings, then, in arriving at the enterprise valuation of a company such as Keeshin, with its past history of enormous deficits, that the price earnings multiplier to be applied to Keeshin should be considerably less than that used by the market investors in purchasing such leading stocks. Various text writers, who have considered the problem of price earnings multipliers, have recognized that, where the enterprise has a high risk factor, that a price earnings multiplier of between four and five times earnings should be used. Certainly an examination of Keeshin's past history, wherein the company suffered in excess of $3,000,000 in losses in the ten years of 1936 to January, 1946, prior to trusteeship, indicates that the Keeshin trucking system has a very high risk factor. As we have seen, its operating ratios are very high, and its percentage of profit has been, for the most part, extremely low. Any unusual occurrence, such as a strike, or a wage increase which is not followed shortly by a rate increase, can result in an enormous deficit in operations almost overnight.

Collier's on Bankruptcy, 14th Ed., Volume 6, page 3855, in discussing questions of valuation states as follows: "But while it is clear that capitalization of prospective earnings is the proper measurement of value, the rate of such capitalization is a matter of some uncertainty. Professor Gerdes has correctly observed that 'no precise formula has been, or can be, evolved to determine the rate on which the capitalization should be based.' Consequently, determination of the rate of capitalization tends to be arbitrary, and it has been suggested that the best standard available is that the rate should be consonant with 'the risk factor of the particular enterprise, measured largely by its past experience and the experiences of businesses similarly situated'." Collier's cites Professor Dewing as suggesting a table of capitalization rates which may be applied, depending upon the character of the business and the consequent risk involved. Professor Dewing suggests, in cases where the business has a high risk factor, a rate of somewhere between 20% and 25%, which would be a price earnings multiplier of between four and five times the earnings.

There is a difference of opinion between the witnesses as to the value of the Keeshin System, as well there might be considering the wide fluctuation of earnings in the past fourteen years of the company's history, and the vast deficits that have been incurred. Dr. Badger testified in 1948 to $1,860,000 as a long term enterprise value. Forrest testified to a value of between $1,150,000 and $1,250,000. Dr. Badger testified in 1949 that the spot or current market value was $1,350,000. The Securities and Exchange Commission has a higher value. The court is of the opinion that the witness overestimated the future earnings expectancy and is further of the opinion that they used a price earnings multiplier which was too high.

From an examination of the evidence and from the court's own knowledge of the problems of the Keeshin System having had the case before it for more than three years, and applying the informed, independent judgment required of the court by the decisions of the United States Supreme Court in reorganization cases, Consolidated Rock Products Co. v. DuBois, supra; Case v. Los Angeles Lumber Products Co., supra, the court is of the opinion that the maximum enterprise value of the Keeshin System, measured by all the reasonable methods of arriving at a valuation of an enterprise, is the sum of $1,700,000. The court therefore finds that the enterprise valuation of the Keeshin System, for the purpose of reorganization is the sum of $1,700,000. Applying the method used by the Securities and Exchange of determining the allocation of total value to be applied to

the various subsidiary corporations and using the percentages of allocation recommended by them, 73% of this figure would be allocated to Keeshin Motor Express Company, Inc., 20% to Seaboard Freight Lines, Incorporated, and 7% to National Freight Lines, Inc.

We come now to the two reorganization plans before the court. The court is of the opinion that, because of economic uncertainty, the fact that substantially two-thirds of the operating equipment is obsolete and that the trucking industry has a very high risk factor, that the debtor company has a past history of large deficits and widely fluctuating net revenues, that a plan providing for a cash sale at or near the enterprise value is the most advantageous to creditors. The court has seen the immense improvement that has taken place in the Keeshin System under the competent management of the trustees. The court is not unmindful of the fact that during the early days of the trusteeship certain general creditors and noteholders persistently insisted the court liquidate this estate, which course the trustees vigorously opposed. It was the trustees' estimate that a sale or liquidation at that time would give general creditors not more than 10% of their claims because of the large wage claims and other prior liens outstanding at that time. If general creditors would at that time have received only ten cents on the dollar, the noteholders of the parent company would have been completely wiped out.

The court permitted the trustees to continue operations and, as a result of profits derived from operations under trusteeship from February 1, 1946 to the present date, the trustees estimate that they have retired more than $300,000 in priorities including wage claims, pursuant to orders approved by this court. It is because of the success of trustees' operations during the past three years that the company has become valuable. By the trustees' Alternate Plan, trustees estimate that general creditors will receive eighty-five cents on the dollar of claims, taking all creditors of the operating companies as a whole. Although an all cash plan is most advantageous to creditors

of this estate, the Walker All Cash Plan must be rejected because its offer of a minimum bid of $1,335,000 does not approximate the enterprise value of the company.

The court is of the opinion the Keeshin-Ratner Plan is not feasible and must be rejected. Stated simply this plan should be amended to provide for more cash and less paper. The proposal to invest only $600,000 in cash is inadequate in view of the obsolete operating equipment, the remaining two-thirds of the unpaid tax obligation, and the provision for payment to general creditors, with the exception of those with claims under $35, of only 30% as a down payment. It does not provide for sufficient cash to give the new company an opportunity to survive. It is the court's view that the only hope of success under the top heavy financial structure proposed by this plan would be a number of years of economic prosperity and a boom in the trucking industry. In view of the small down payment provided for the creditors, the prospect of the general creditors ever being paid in full is not probable. In this high risk industry, with the heavy deficits suffered by the Keeshin System in the past, creditors should not be asked to take notes for 70% of their claims as they bear all the risks of the enterprise with no commensurate return, and, under this plan, with no adequate security and with no reasonable prospect that their notes will ever be paid. In addition to that, because of the inadequacy of the investment offered by these proponents, the company would not have sufficient cash with which to purchase the necessary equipment which it must have in order to operate at a satisfactory profit.

The court was impressed by the testimony of the witness Davis, who is vice-president of a large trucking company. Davis testified that a minimum of 250 trailers, 150 tractors, and 100 trucks would be necessary to be purchased at once, and that, without this equipment, the company would have no chance of achieving a 5% operating ratio. The Keeshin-Ratner Plan proposes to purchase 120 trailers, 60 tractors and no trucks during the first year.

This is inadequate and would result in the company being unable to reach its objective of a 5% operating ratio.

In the opinion of the court the $600,000 proposed to be placed into the enterprise by these proponents is not sufficient to enable the company to weather the economic storms of the first few years following reorganization. Furthermore, the proponents of this plan admit that it is essential to the success of their plan that the company earn $500,000 a year before taxes, especially for the first two or three years after reorganization. If 1949 is any criterion, and it must be taken into consideration, then there is no assurance that this amount can be realized in the immediate future. Certainly, in the opinion of the court, with the inadequate equipment with which the proponents of this plan state they will operate, it is improbable that they will realize the minimum earnings that they say they must produce in order to succeed and will not be able to meet the obligations which they will have to assume under the financial structure proposed under their plan.

In the Keeshin-Ratner Plan the proposed financial structure is substantially undercapitalized, and, as the Securities and Exchange Commission has pointed out, is heavily overburdened with debt, is top heavy, and is complicated with five classes of debt securities, two classes of preferred stock and common stock. Since the date of the hearing, this plan has again been amended by eliminating the junior notes and consolidating them with the issue of second preferred stock. However, this amendment has not relieved the top heavy debt structure proposed by this plan. It has merely transferred it from one class of debt to another, leaving the total debt structure exactly the same as before.

For the reasons stated the court concludes that the Trustees' Alternate Plan and the Keeshin-Ratner Plan must be rejected.

All parties are given twenty (20) days from this date within which to present amended plans.