**In the Matter of SPECTRUM ARENA, INC., Debtor.**

**No. 30437.**

United States District Court, E. D. Pennsylvania.

Dec. 23, 1971.

---

20. See Note 6, *supra,* and text accompanying.

Sidney Chait, Philadelphia, Pa., for Trustees.

LeRoy E. Perper, Philadelphia, Pa., for ARA Services.

I. Grant Irey, Jr., Philadelphia, Pa., for Fidelity Bank.

Gilbert W. Oswald, Philadelphia, Pa., for Foreman-Snider.

Philip P. Kalodner, Philadelphia, Pa., for Debtor.

## IN PROCEEDINGS FOR REORGANIZATION OF A CORPORATION UNDER CHAPTER X OF THE BANKRUPTCY ACT

Re: Confirmation of Trustees' Plan

HIGGINBOTHAM, District Judge.

### I.

### INTRODUCTION

After three and one-half years, the corporate reorganization of the Spectrum has finally reached the stage where I have been presented at a confirmation hearing a most viable plan for ultimate payment of all Creditors—secured and unsecured. I approve the Trustees' Plan as submitted.

On May 1, 1968, the Spectrum Arena, Inc., (hereinafter referred to as the "Debtor" or "Spectrum") was involuntarily placed in reorganization under Chapter X of the Bankruptcy Act of July 1, 1898, (11 U.S.C. §§ 501, et seq.). The only plan for reorganization currently before me[1] is the plan proposed originally by Earl M. Foreman and Edward N. Snider and currently endorsed and submitted by the able Trustees,

Harvey N. Schmidt and William David Webb. (This plan is hereinafter referred to as "Plan", "Trustees' Plan" or "Foreman-Snider Plan".)

The Trustees' Plan has been before me since it was first filed on April 15, 1971. On August 31, 1971, I entered an Opinion and Order pursuant to § 172 of the Bankruptcy Act (11 U.S.C. § 572) finding that the Trustees' Plan was "worthy of consideration" for submission to the Securities and Exchange Commission (hereinafter referred to as "SEC"). Having received a letter from the SEC on September 16, 1971, that they would not file a report, on October 28, 1971, I filed a major Opinion and Order which, *inter alia,* approved the Trustees' Plan as complying with § 216 of the Bankruptcy Act (11 U.S.C. § 616), ordered the Trustees' Plan submitted to the creditors for acception or rejection, (Opinion of October 28, 1971, 340 F.Supp. pp. 781–783), set November 24, 1971 as the final date for voting, and ordered the Trustees to file with this Court by December 1, 1971, an affidavit certifying the results of the voting. On December 1, 1971, the Trustees, as ordered, submitted the requisite affidavit (Docket No. 254) certifying that seventy-eight percent (78%) of the creditors in dollar amount had accepted the Trustees' Plan *and no Creditor voted against the Plan.* The Order of this Court filed October 28, 1971, set December 8, 1971 as the time for a hearing on the confirmation of the Trustees' Plan. At the confirmation hearing, Mr. Chait, attorney for the Trustees, filed with this Court an affidavit certifying that notice of the confirmation hearing, pursuant to § 179 of the Bankruptcy

---

1. A second plan for reorganization had been proposed by Philip P. Kalodner, Esquire, as stockholder, creditor and counsel for the debtor corporation. That plan is no longer before me as there is no provision in the Bankruptcy Act for the offering of substitute plans once the Trustees' plan has been approved by this Court pursuant to § 174 of the Bankruptcy Act (11 U.S.C. § 574), unless the Kalodner plan could be deemed an alteration or modification of the approved plan. I

have today found in a separate Order that Mr. Kalodner's petition to alter or modify the Trustees' Plan by substituting therefor his Plan (Docket No. 275) crossed the brink of what constitutes an alteration or modification and accordingly his petition was denied. (See, Country Life Apts. v. Buckley, 145 F.2d 935, 937 (2nd Cir. 1944); Opinion of December 23, 1971, 340 F.Supp. 807, Re: Alteration or Modification of Trustees' Plan.

Act (11 U.S.C. § 579) was mailed to creditors on November 23, 1971.[2]

For the reasons appearing hereinafter, I find that the Trustees' Plan of Reorganization of the Spectrum meets all the requirements of § 221 of the Bankruptcy Act (11 U.S.C. § 621) and accordingly is hereby confirmed.

## II.

## SHOULD THE TRUSTEES' PLAN BE CONFIRMED?

The hearing on confirmation was held, as noted above, on December 8, 1971. Thus, the only major issue remaining for my decision is whether the Trustees' —Foreman-Snider Plan—meets the requirements of § 221 of the Bankruptcy Act (11 U.S.C. § 621) and therefore should be confirmed. The requirements for confirmation under § 221 of the Bankruptcy Act (11 U.S.C. § 621) are that the judge must be "satisfied" that the following five requirements are met: (1) the Plan must meet the requirements of §§ 199 and 216 of the Bankruptcy Act (11 U.S.C. §§ 599, 616); (2) the plan must be fair and equitable, and feasible; (3) the proposal and acceptances must have been in good faith; (4) all payments to be made under the Plan must be disclosed to the Court or if fixed after confirmation, subject to the approval of the Court; and (5) the identity, qualifications and affiliations of the persons who are to be directors or officers upon consummation have been disclosed and that their appointment "is equitable, compatible with the interests of the creditors and stockholders and consistent with public policy."

### A. *Insolvency of the Debtor Corporation*

No provision is made in the Trustees' Plan for compensating the shareholders, and if the Debtor is insolvent, no compensation to stockholders is required pursuant to § 216(8) of the Bankruptcy Act, 11 U.S.C. § 616(8).[3]

Conversely, if the Debtor Corporation is solvent, the Trustees' Plan must be rejected.

■ A threshold question for my determination, and in fact the one which appears to be litigated most fiercely by Mr. Kalodner, is the issue of whether the Debtor Corporation *as of the dates of the confirmation hearing* and this adjudication was insolvent. As prerequisites for submission of the plan as to its worthiness for consideration to the SEC and submission of the plan to the creditors, I have made prior determinations that the Debtor Corporation was then insolvent. (See, Opinions of August 31, 1971, 340 F.Supp. pp. 766–767, and October 28, 1971, 340 F.Supp. pp. 778–779.) However, these prior determinations are not *res adjudicata* at a confirmation hearing. My prior findings of insolvency could be and in fact were challenged. The parties appear to have no genuine dispute as to the degree of net indebtedness. They appear to concede that the net liabilities as of December 31, 1971 would be approximately $9,488,000.00.

In their briefs the parties used the net liabilities of the Spectrum as $9,464,000.00 (Trustees' brief, p. 3; Kalodner's brief, p. 13). I had a conference in my chambers on December 21, 1971, with counsel and the Business Manager of the Spectrum, to ascertain if we could more precisely estimate the net liabilities as of December 31, 1971. Pursuant to that testimony and the schedules there submitted, I find that the net liabilities of the Spectrum as of December 31, 1971 will be $9,488,000.00.[4]

---

2. No notice was mailed to the shareholders by reason of my prior findings of insolvency of the debtor corporation. Opinion of August 31, 1971, 340 F.Supp. pp. 765–767; Opinion of October 28, 1971, 340 F.Supp. pp. 778–779.

3. Opinion of August 31, 1971, 340 F.Supp. pp. 765–767; Opinion of October 28, 1971, 340 F.Supp. pp. 778–779.

4. This net liability includes the Foreman mortgage in the approximate amount of

To reach the threshold of solvency, the value of the leasehold in the instant case must be no less than $9,488,000. To resolve this critical issue, the Trustees sought a most distinguished appraiser as an independent expert from a most reputable realty concern—Mr. Reaves Lukens of Jackson-Cross & Company. Mr. Lukens was most impressive as a witness. Despite vigorous cross-examination, he remained calm, deliberate, knowledgeable and seemingly totally impartial. He has had more than 13 years experience in the appraisal of real property. He has taught at several universities and institutes; the Trustees recognized the importance of the admonition in several cases as to the desirability in choosing independent appraisers.

Professor Max Radin has emphasized:

"The judge should be particularly wary of data furnished by those who will directly or indirectly profit from its [the plan's] acceptance; and while it may be that in an exceptional case no other valuation may be available or obtainable, yet it would seem that the judge could always supply any lack by the appointment of independent appraisers." [5]

Collier On Bankruptcy notes that:

"A systematic, realistic and reasonably exact valuation is called for, based on a *competent disinterested and informed* appraisal of the property." (Emphasis added.) (6A Colliers, Bankruptcy, ¶ 11.05 at p. 590.)

See also, In re Dutch Woodcraft Shops, 14 F.Supp. 467, 470 (W.D.Mich. 1935), where the Court stated:

"[T]he results sought in this case could be sustained only after an appraisal made by appraisers thoroughly competent and wholly disinterested. . . ."

In the instant case, the only witness for the Debtor was Mr. Kalodner himself, a purported owner of more than 92% of the stock, a proponent of the Plan, and his own counsel. Thus at the outset, it becomes relevant to ask whether the testimonial value of Mr. Kalodner has that same probative weight of the "thoroughly competent and wholly disinterested appraiser" referred to by the commentators and in the leading cases. While Mr. Kalodner's distinction as an outstanding lawyer is obvious, legal experience is not in itself the equivalent of the extensive qualifications of Mr. Lukens, a certified appraiser, who has taught this subject at the Philadelphia Board of Realtors, Southern Methodist University, Drexel University, the University of Notre Dame and at several institutes.

Mr. Kalodner's failure to produce an expert witness on this critical issue cannot be attributable to the lack of forewarning. For, at page 779 of my Opinion of October 28, 1971, I noted:

"There was no credible evidence presented which could support, even inferentially, a finding of solvency. It is intriguing that the experienced counsel for the Debtor, Mr. Kalodner, failed to put on any expert to corroborate his allegation of solvency. Rather, he pursued his case by making trivial and peripheral challenges to the report of the experts from the Jackson-Cross Company. *Is it asking too much for someone who wants to sell to the public $9,500,000 worth of bonds to present even one expert who will testify as to the value of the leasehold? Adroit cross-examination on peripheral issues is not a substitute for a sound, economic presentation based on market value data by a recognized and scholarly appraiser.*"

(Emphasis added.)

Despite the above strong language and warning as to the prior testimonial deficiency of his case, Mr. Kalodner again

---

$1,464,000. The term "net liabilities" as used herein means the total liabilities of the Debtor minus cash and accounts receivable.

5. Radin, "Fair, Feasible and in the Public Interest" (1941) 29 Calif.L.Rev. 451, 473, as quoted in 6A Colliers, Bankruptcy, ¶ 11.05, at p. 591, Fn. 14.

failed at the Confirmation Hearing on December 8, 1971 to put on any testimonial evidence to support his solvency allegation. A lawyer—even though adroit and nimble—has no more inherent expertise to appraise the value of real estate than he has to diagnose a cardiac deficiency. Having failed to put on even one person, who is trained in the appraisal of real estate, he nevertheless argues with great vigor that some portions of Mr. Lukens' testimony must be accepted and other portions rejected, all of which must become modified into a Kalodner formula for solvency. The Spectrum cannot move from its present death bed of insolvency to the sought vitality of a solvent-going corporation by mere legal attacks on Mr. Lukens.

I accept Mr. Lukens' analysis that the fair market value of the leasehold is $8,000,000, as a conclusion which is justified on credible persuasive evidence, and further, as a conclusion which has been neither diluted nor weakened by extensive cross-examination. I accept Mr. Lukens' conclusion that the annual adjusted income to leasehold should be $1,100,000.00. Though the Spectrum has had sufficient earnings under which one could argue for an annual net income to leasehold at $1,200,000.00, this figure would be contingent upon operating the Spectrum without adequate reserves, adequate maintenance, and adequate manpower. I agree with Mr. Lukens' analysis that the Trustees have run the operation on an extremely "lean" basis; in fact for good reason the Trustees have been *masters in frugality*. The executive staff, particularly Mrs. Rothman and Mr. Freeman, have been underpaid and understaffed. The maintenance has been kept to a bare minimum, yet in a real sense the Trustees had no alternative. For they were not paying *any interest on the secured mortgages of over $8,000,000*. Thus they had to maintain a mere holding operation while trying to maximize income. This mastery in frugality cannot be expected as a prologue for the indefinite future.

■ My prior findings of insolvency are here again reaffirmed. My findings are based on a capitalization of future earnings of the Spectrum. As the Supreme Court stated in Consolidated Rock Products v. DuBois, 312 U.S. 510, 526, 61 S.Ct. 675, 685, 85 L.Ed. 982 (1941):

" '[T]he commercial value of property consists in the expectation of income from it.' (citations omitted). Such criterion is the appropriate one here, since we are dealing with the issue of solvency arising in connection with reorganization plans involving productive properties. It is plain that valuations for other purposes are not relevant to or helpful in a determination of that issue, except as they may indirectly bear on earning capacity. (citations omitted.) The criterion of earning capacity is the essential one if the enterprise is to be freed from the heavy hand of past errors, miscalculations, or disaster, and if the allocation of securities among the various claimants is to be fair and equitable. (citations omitted.) Since its application requires a prediction as to what will occur in the future, an estimate, as distinguished from a mathematical certitude, is all that can be made. But that estimate must be based on an informed judgment which embraces all facts relevant to future earning capacity and hence to present worth, including, of course, the nature and condition of the properties, the past earnings record, and all circumstances which indicate whether or not that record is a reliable criterion of future performance."

Only two terms ago the Supreme Court repeated verbatim the above quote from Consolidated Rock Products v. DuBois, *supra*, in Protective Committee for the Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 442, 88 S.Ct. 1157, 1172, 20 L.Ed.2d 1 (1968), rehearing denied, 391 U.S. 909, 88 S.Ct. 1649, 20 L.Ed.2d 5 (1968).

I find the Spectrum to be insolvent,[6] by a minimum of $1,488,000.00.

### B. *Compliance with § 221*

1. § 221(1).

██ Having determined that the Spectrum is insolvent the Court must determine whether the requirements of § 221 of the Bankruptcy Act (11 U.S.C. § 621) have been complied with in full. The first requirement of § 221(1) (11 U.S.C. § 621(1)) is that, pursuant to § 199 of the Bankruptcy Act (11 U.S.C. § 599), all claims of the United States for taxes must be paid in full. The Trustees' Plan in ¶ V(4) expressly provides that all claims of United States for taxes will be paid "in cash in full," thus complying with § 221(1) (11 U.S.C. § 621(1)).

Also under § 221(1) (11 U.S.C. § 621(1)) is the requirement that the plan comply with subchapter X of the Bankruptcy Act. The only provision contained in subchapter X is § 216 (11 U.S.C. § 616). In my Opinion of October 28, 1971, 340 F.Supp. 767, I previously found as required by § 174 of the Bankruptcy Act (11 U.S.C. § 574) that the Trustees' Plan complies with § 216 (11 U.S.C. § 616). I today reaffirm my prior findings that the Trustees'—Foreman-Snider Plan complies with the requirements of § 216 (11 U.S.C. § 616) for the following reasons:

(1) The Plan contains in ¶ I provisions specifying the modification or alteration of the rights of the fourth mortgage holder, the unsecured creditors, and the shareholders. § 216(1), Plan ¶ I;

(2) The Plan deals with all property of the Debtor and passes all property to the new company, (§ 216(2)), Plan ¶ II;

(3) The Plan provides for the payment of all costs and expenses of administration and other allowances as the Judge shall direct (§ 216(3)), Plan ¶ 3;

(4) The Plan rejects no executory contracts, § 216(4), Plan, ¶ IV;

(5) The Plan specifies that the claims of the Fidelity Bank, ARA, non-mortgage lienholders, and claims for taxes (other than real estate taxes)[7] of the United States, the Commonwealth of Pennsylvania, the City of Philadelphia and the School District of Philadelphia are to be paid in cash in full. (§ 216(5)), Plan ¶ V;

(6) There are no creditors or stockholders not affected by the Plan. (§ 216(6)), Plan ¶ VI;

(7) The Plan provides that any class of creditors which is affected by and does not accept the Plan will receive adequate protection under one of the methods provided in § 216(7) of the Bankruptcy Act, § 216(7), Plan, ¶ VII;

(8) The Plan makes no provision for shareholders by reason of this Court's finding of insolvency, § 216(8), Plan, ¶ VIII;

(9) The Plan provides the means for execution of the Plan, § 216(10), Plan ¶ IX;

(10) The Plan provides that directors and officers of the new company will be elected by shareholders according to law and approved by the Court on consummation, § 216(11), Plan, ¶ X; and

(11) The Plan enumerates the mandatory provisions which shall be included in the Charter of the new company, § 216(12), Plan, ¶ XI.

The Plan as proposed was subject to two conditions:

(1) A settlement of claim for real estate taxes due the City of Philadelphia

---

6. In determining that the Spectrum is insolvent, I have considered the potential availability of income due the Spectrum from the Blue Line Club, Inc., after 1974. See, Opinion of December 23, 1971, 340 F.Supp. 786, Re: Petition for an Accounting of ARA Services, Inc.

7. By my Opinion of August 9, 1971, 330 F.Supp. 125, I held that the Spectrum leasehold was not subject to City of Philadelphia real estate taxes.

and the School District of Philadelphia, and

(2) That the City of Philadelphia (as it has agreed to do) waives and declares cured all defaults claimed to exist under the Construction and Lease Agreement of May 26, 1966. The City of Philadelphia has waived all those defaults (N.T., pp. 72–76, July 23, 1971), and by my Opinion of August 9, 1971, I have removed the first condition.

Accordingly, I find that the Trustees' Plan of reorganization fully complies with § 221(1) of the Bankruptcy Act. (11 U.S.C. § 621(1))

2. § 221(2)—*Fair and Equitable and Feasible*

Under § 221(2), (11 U.S.C. § 621(2)) a Plan can be confirmed only if the Plan is found to be "fair and equitable, and feasible." I have previously found pursuant to § 174 (11 U.S.C. § 574) that the Trustees' Plan is "fair and equitable and feasible" (Opinion of October 28, 1971, 340 F.Supp. pp. 779–781), and except as modified hereinafter I reaffirm my findings.

In order for a Plan to be "fair and equitable," it must meet the absolute priority test, that is, it must provide "participation for claims and interests in complete recognition of their strict priorities . . . "[8] In other words, "each class in descending rank must receive full and complete compensation . . . before the next class below may properly participate."[9] The Supreme Court has further held that the absolute priority rule applies to insolvent corporations.[10]

Under the Trustees' Plan of Reorganization, the holder of the first and second mortgages on the Spectrum, Fidelity, is to be paid in cash on consummation with interest of 7.5%. In a letter dated September 27, 1971 (Docket No. 228), Fidelity Bank took the position that in Fidelity's judgment, December 31, 1971, is the latest date to which Fidelity would agree for full payment of its secured claims without exercising its right to collect the default rate of interest of ten percent. Further, Fidelity has agreed that conditioned on such payments actually being received on or before December 31, 1971, it will (1) waive any claim to the "default" interest of ten percent; (2) compute its final interest claim only on principal, and not on principal and previously accrued but unpaid interest; and (3) claim only fifty percent of its total out-of-pocket charges, costs and expenses as of the date of payment. The holder of the third mortgage, ARA, will release its third mortgage claim and be paid in full subject to its agreement with Foreman-Snider to loan the new corporation $1,400,000. The Foreman fourth mortgage claim will be satisfied by the issuance of shares of stock in the new company or be wholly subordinated both to all debt incurred in financing the new company and to the claims of the present unsecured creditors. The claims of the unsecured creditors shall be paid in full as follows:

(1) Fifty percent (50%) to all unsecured creditors (except Leonard Tose) upon consummation;

(2) The balance (except Tose) in four annual equal installments;

(3) The Tose claim, as reduced to $250,000 in agreement approved by the Court, will be paid $50,000 at consummation and the balance in five annual equal installments beginning at the end of the fifth year following consummation.

All administrative costs, taxes (other than real estate taxes),[11] and valid mechanic's lien claims shall be paid in full.

8. 6A Colliers, ¶ 11.06, at 613; Case v. Los Angeles Lumber Products, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939).

9. 6A Colliers, ¶ 11.06, at 614.

10. Consolidated Rock Products v. DuBois, 312 U.S. 510, 527, 61 S.Ct. 675, 85 L.Ed. 982 (1941).

11. By my Opinion of August 9, 1971, I held that the Spectrum leasehold was not subject to City of Philadelphia real estate taxes.

No provision is made for stockholders by reason of the Spectrum's insolvency.[12] As the above analysis indicates, there is no question that the Plan as proposed satisfies the "absolute priority" rule. Therefore, I find that the Plan is "fair and equitable."

In addition to finding that the proposed Plan is "fair and equitable," § 221(2) of the Bankruptcy Act, 11 U.S.C. § 621(2) also requires a Court to determine whether or not the Plan is "feasible". "Basically, feasibility involves the question of the emergence of the reorganized debtor in a solvent condition and with reasonable [probability] of financial stability and success."[13] Under the Trustees' Plan, there exists a total of $11,224,926 to be refinanced on December 31, 1971. (Projection of Spectrum Liabilities, Ex. T–9). To meet the above cash requirement, the Trustees' Plan proposes the following:

(1) The First Pennsylvania Bank has agreed to lend $6,500,000, payable over fifteen years at 7.5% per annum (Ex. F–S 1);

(2) ARA has agreed to lend $1,400,000 payable over twenty years at a rate ½% over prime (Ex. F–S 3); and

(3) The Foreman fourth mortgage claim will be contributed to the new company, either by subordination or capitalization in exchange for stock in the new company.

In addition, the Trustees will have funds available in the bank and in the accounts receivable.[14] Finally, the First Pennsylvania Bank has agreed to extend a $500,000 line of credit on a guarantee by Foreman, Snider and their wives, at an interest rate of 1¾% over prime to meet any deficit or to finance any needed capital or other improvements. Also, it should be noted that Mr. Foreman and Mr. Snider have agreed to devote their personal resources to whatever extent is necessary. (Hearing before Higginbotham, J., July 23, 1971, N.T., 98.)

To view the situation from the prospective of cash flow, I accept the Jackson-Cross estimate of December 6, 1971 of annual cash flow of $1,100,000.[15] As deductions against this $1,100,000, there would be a debt service to First Pennsylvania of $723,000 debt service to ARA of $150,000, payments to unsecured creditors of $55,500, and interest to Tose of $12,000 for a total of $940,500, leaving a balance of $159,500. Thus, from any point of view the Plan has the "reasonable expectation of success" which the statutory test of feasibility requires.[16]

Accordingly, I find, pursuant to § 221 (2) of the Bankruptcy Act, 11 U.S.C. § 621(2), that the Trustees' Plan is "fair, equitable and feasible."

3. § 221(3)

Under § 221(3) (11 U.S.C. § 621(3)), the judge must determine that "the proposal of the plan and its acceptance are in good faith and have not been made or procured by means or promises forbidden by this title." The trustees have explained in their Proposed Plan the circumstances under which it was developed and proposed. There is no question but that my finding that the Plan was proposed in good faith is essentially satisfied by my above finding that the Plan is "feasible."[17] In addition, the Trustees have provided this Court with an Affidavit certifying the mailing of ballots (Docket No. 280) and an Affidavit show-

---

12. See, pp. 796–799 *supra*.

13. 6A Colliers, ¶ 11.07, at 638.

14. Mrs. Rothman testified at the Confirmation Hearing on December 8, 1971 that as of December 31, 1971, based on projected income, the total of cash and accounts receivable was estimated to be $1.936 million. (N.T. 47)

15. In the original Jackson-Cross appraisal of July 22, 1971, Mr. Lukens estimated the total cash flow to be $1.0 million.

While neither the original $1.0 million figure or the new $1.1 million estimate could not categorized as excessively liberal, the latter figure appears to be sufficiently rational for my adoption. However, it should be noted that even the higher Jackson-Cross estimate of net income is insufficient to move the Spectrum to a solvent position.

16. 6A Colliers, ¶ 11.07, at 638.

17. 6A Colliers, ¶ 11.08, at pp. 644–646.

ing that 78% of the creditors voted in favor of the Plan and no creditor voted against the Plan. (Docket No. 261) On a view of these documents and based on the fact that no objection has been noted by anyone to the good faith manner in which the Plan was proposed or accepted, I find that the requirement of "good faith" has been met. Finally, I find that no acceptance was procured by means of forbidden promises as there is no evidence of any agreement [18] which violates this subsection. Therefore, I find that all requirements of § 221(3), (11 U.S.C. § 621(3)) have been fully met.

4. § 221(4)

The requirements of § 221(4), (11 U.S.C. § 621(4)) are that all expenses, and payments for services and costs arising in connection with the reorganization proceeding are reasonable and are fully disclosed to the judge prior to confirmation or if fixed after confirmation, are subject to the approval of the judge. Since the Spectrum first was placed in reorganization on May 1, 1968, I have carefully examined all requests for compensation and have approved only those which were reasonable. In addition, the Trustees' Plan ¶ III permits payment of future costs only which the judge has approved. In addition, the Trustees'—Foreman-Snider Brief (Docket No. 277) states for the record that all future payments will be subject to the approval of the judge. Thus, I find that the Trustees' Plan meet the requirements of § 221(4), (11 U.S.C. § 621(4)).

5. § 221(5)

■■ The final requirement for confirmation is that provided in § 221(5) ·(11 U.S.C. § 621(5)):

" . . . the identity, qualifications, and affiliations of the persons who are to be directors or officers, or voting trustees, if any, upon the consummation of the plan, have been fully disclosed, and that the appointment of such persons to such offices, or their continuance therein, is equitable, compatible with the interests of the

creditors and stockholders and consistent with public policy."

This provision was designed "to insure the creditors and stockholders a management faithful to its trust and able to perform its duty so that the reorganized company may operate as a successful economic unit," 6A Colliers, Bankruptcy, ¶ 11.10, at p. 652. A District Judge should regard the prospective management " . . . from a larger view—that of the public interest in general, over and beyond the immediate interest of the creditors and stockholders, although of course these interests in many cases may be intertwined." Colliers, *supra*, ¶ 11.10, at p. 652. See also, the discussion of this provision by the then SEC Commissioner, now Justice Douglas, when a preliminary version of Chapter X was before the House of Representatives. (6A Colliers, Bankruptcy, ¶ 11.10, at p. 653.)

Mr. Kalodner in his Brief on Confirmation (Docket No. 281, p. 19) asserts bluntly: "The appointment of Edward Snider and Earl Foreman as officers of the reorganized corporation is not equitable, compatible with the interests of the creditors or consistent with public policy." The two-pronged attack upon Mr. Snider is that Mr. Snider is the chief executive officer of one of the Debtor's major tenants, The Philadelphia Flyers Hockey Club, and secondly, that he has " . . . a rather bad record in the payment of his rent to the Debtor during the period of the Trustees' administration of its affairs." Admittedly, at some times The Philadelphia Flyers Hockey Club has been delinquent in payment, but they are current now. Mr. Snider is the chief executive officer of the major tenant, The Philadelphia Flyers Hockey Club and will be a major corporate officer of the lessor of the Spectrum.

Under the Trustees'—Foreman-Snider Plan there is a substantial likelihood (if there are no appeals or stays of proceedings) that the secured creditors could be paid in full before the end of this year, and that the unsecured creditors

18. 6A Colliers, ¶ 11.08, at p. 646.

could be paid 50% of their fully valid claims before the end of this year.

Yet Mr. Kalodner asserts that "a better plan is available for confirmation, to wit, the one proposed on behalf of the Debtor Corporation."

If we could live in a world of the ideal as to prospective purchasers, in that dream world the Foreman-Snider Plan could become a second choice—that is if we NOW had a plan which would assure payment to all of the secured creditors before the end of 1971, and which would NOW match the payments of the Foreman-Snider Plan to all the unsecured creditors, and *if* the proponents additionally NOW had a line of credit of $500,000, and if the proponents did not own a major interest in a tenant of the Spectrum—then—and only then—might the Foreman-Snider Plan become a second choice. The Spectrum cannot operate in a dream world; we must operate within the economic realities. Despite the present Christmas season, if I reject the Foreman-Snider Plan there will be no Santa Claus at the Spectrum's door to pay the $9,488,000 worth of indebtedness and additionally to leave a $500,000 line of credit. The truth is that there is no viable second alternative. Under Mr. Kalodner's Plan, seasons could go by and years could expire with nothing more than his hopes that some vitality can be added to the skeleton of his Plan. Section 221(5) (11 U.S.C. § 621(5)) talks in terms of consistency with public policy. On this issue, why should the creditors and the public have to be subjected to such unnecessary contingencies as are required in the Kalodner Plan when there is a viable plan available now. If one uses as a touchstone "public policy", what public policy justification could there be in defeating the instant plan while hoping for the ultimate evolvement of the Kalodner Plan? For the events of the last six months indicate that the only consistency of Mr. Kalodner's Plan and Petitions is an endemic one, amendment after amendment, change after change, like the continuous roar of waves which never cease and promised results which never materialize. Creditors cannot pay their bills with promises of future plans. When the instant Kalodner Plan was proposed in June, 1971, it was recognized that it would require the passage of an Ordinance by the Philadelphia City Council. Six months and two seasons later the required Ordinances have not yet even been introduced before the City Council. In this interim, the voters have elected to change their Mayor and many of their Councilmen, but the Kalodner Plan still has not gotten off the drawing board. The Kalodner Plan would require a ruling by the United States Internal Revenue Service that the proposed revenue bonds will be tax exempt, and we have not been advised of any ruling, though almost six months have expired. The above are just a few of the contingencies which would have to be resolved before the Kalodner Plan could be considered for a ruling by a court as to whether it is "worthy of consideration," pursuant to § 172 of the Bankruptcy Act (11 U.S.C. § 572).

After considering Mr. Kalodner's request that I reject the Trustees'—Foreman-Snider Plan, and upon applying § 221(5) (11 U.S.C. § 621(5)), I find that the appointment of the persons to be named in office is "equitable, compatible with the interests of the creditors and stockholders and consistent with public policy."

Let me repeat again what was stated in my Opinion of October 28, 1971, 340 F. Supp. p. 783:

"Although on Broadway the backers may seek a record for the longest continued performance, in corporate reorganization an unending tenure of trusteeship may indicate a financial disaster rather than a financial success.

"If the Trustees' present Plan is accepted, some favorable comment must be made about the important role which Fidelity Bank has exercised in making the instant Plan possible. Fidelity Bank has made a significant gesture to the citizens of Philadelphia by its willingness to accept an immediate total payment of all claims at a rate of

interest of seven and one-half percent —rather than waiting for a potentially larger amount over a protracted period in the future at a default rate of interest of ten percent. This concession means that there will be $500,000 more available now for payment of unsecured creditors; without Fidelity's waiver, the unsecured creditors would *not* be paid in full unless the present purchase price was increased by $500,000.-00. Similarly, the First Pennsylvania Company has agreed to a first mortgage at a relatively low interest rate —again with apparent concern that the Spectrum become a viable financial entity to serve its public purpose."

The time of Fidelity's offer runs out on December 31, 1971. They cannot be required to grant endless concessions on a debt which is already three and one-half years overdue. All of the Creditors have been enmeshed in a whirlwind of promises and hopes for more than three and one-half years; that is long enough.

By this ruling, by December 31, 1971,[19] the Trustees will be able to close their final curtain at the Spectrum so that the just debts of the past can be paid and the Spectrum can move from a plethora of hopes to the realities of payments.[20]

## ORDER CONFIRMING TRUSTEES' PLAN OF REORGANIZATION

And now, this 23 day of December, 1971, a hearing having been held on the 8th day of December, 1971, pursuant to an Order of this Court dated October 28, 1971, to consider confirmation of the Trustees' Plan of Reorganization, as amended, and such objections as might be made to confirmation; and notice of said hearing having been given as required by Section 179 of the Bankruptcy Act and in accordance with the said Order dated October 28, 1971; and the Trustees' Plan of Reorganization, as amended, having been approved by Order dated October 28, 1971, and thereafter submitted for acceptance to creditors entitled to vote thereon; and it appearing from an affidavit filed by the Trustees that written acceptances of the Plan have been filed by or on behalf of unsecured creditors holding more than two thirds in amount of the filed and allowed (for voting purposes) claims;

The Court is satisfied and does find:

(a) the provisions of Article VII, Section 199, and Article X of this Chapter have been complied with;

(b) the plan is fair and equitable, and feasible;

(c) the proposal of the Plan and its acceptance are in good faith and have not been made or procured by means or promises forbidden by the Bankruptcy Act;

(d) all payments to be made or promised by the debtor or by a corporation issuing securities or acquiring property under the plan or by any other person, for services and for costs and expenses in, or in connection with, the proceeding or the Plan and incident to the reorganization, will be fixed after confirmation of the Plan, and will be subject to the approval of the Court;

(e) the identity, qualifications, and affiliations of the persons who are to be directors or officers, upon the consummation of the plan, have been fully disclosed, and that the appointment of such persons to such offices, or their continuance therein, is equitable, compatible with the interests of creditors and consistent with public policy;

(f) that the value of the Debtor's assets is less than its liabilities and that the Debtor is insolvent.

19. Of course if there are appeals wherein a stay or supersedeas is granted payment could possibly be delayed.

20. This Opinion is filed pursuant to Rule 52(a), Federal Rules of Civil Procedure (28 U.S.C. Rule 52(a)) and constitutes my findings of fact and conclusions of law, and to the extent they are not modified, I incorporate the findings of fact and conclusions of law in my prior Opinions of August 9, 1971, August 31, 1971, and October 28, 1971.

Now, therefore, it is ordered:

1.    The Trustees' Plan of Reorganization, as amended, is hereby confirmed.

2.    The provisions of the Plan shall be binding upon the Debtor, upon every other corporation issuing securities or acquiring property under the Plan, and upon all creditors and stockholders whether or not such creditors are affected by the Plan or have accepted it or have filed proofs of their claims or interests and whether or not their claims or interests have been scheduled or allowed or are allowable.

3.    Subject to the further directions of this Court, the Debtor, the Reorganized Company, and every other corporation organized or to be organized for the purpose of carrying out the Plan, and the Trustees are directed to comply with the provisions of the Plan and with all orders of the Court relative thereto and shall take all action necessary and required to carry out and consummate the Plan pursuant to applicable state and federal laws and the further Orders of this Court.

4.    All Creditors and stockholders of the Debtor, the persons participating in these proceedings, and all other persons, are hereby permanently enjoined and restrained from doing any act or taking any action interfering with these proceedings or with the enforcement or carrying out or consummation of the terms and provisions of the Plan, or with the Orders of this Court relative thereto.

5.    The property dealt with by the Plan, when transferred to the Reorganized Company, shall be free and clear of all claims and interests of the Debtor, creditors and stockholders, whether, or not such claims are provable under Section 63 of the Bankruptcy Act, 11 U.S.C. § 103, and whether secured or unsecured, liquidated or unliquidated, fixed or contingent, except such claims and interests as are otherwise expressly provided for in the Plan or in this Order.

6.    The requirements of Special Bankruptcy Rule X–10 of this District Court, pertaining to the filing of objections to claims prior to confirmation of the Plan, is hereby waived and dispensed with; and the Trustees, or the Reorganized Company, may file objections to any claim or claims at any time subsequent to confirmation of the Plan and until further Order of this Court.

7.    The outstanding capital stock of Spectrum Arena, Inc., Debtor, shall be deemed cancelled and new stock in the Reorganized Company shall be issued pursuant to the Plan.

8.    The Trustees shall retain all funds heretofore deposited in their Trustees' bank accounts, or invested by them, from which funds the Trustees shall make all payments which, by the provisions of the Plan, are required to be made.

9.    The distribution of funds shall be made by the Trustees pursuant to the Plan in accordance with the provisions of Section 224(4) of the Bankruptcy Act; provided, however, that the provisions of paragraph 6 of this Order, waiving Rule X–10 of the Special Bankruptcy Rules of this District Court and extending the time for filing objections to proofs of claim beyond the date of confirmation of the Plan, shall be deemed to authorize the Trustees, or the Reorganized Company, to defer distribution to creditors whose claims, as filed, are contingent, unliquidated or disputed until such time as objections to such claims are prepared and filed and the allowance or disallowance of such claims shall be adjudicated.

10.    The Court reserves jurisdiction to make such Orders in aid of consummation of the Plan as it shall deem proper.