**In re BUSH INDUSTRIES, INC., Debtor.**

**No. 04–12295 B.**

United States Bankruptcy Court, W.D. New York.

Sept. 16, 2004.

Hodgson Russ LLP (Garry M. Graber, of counsel, Julia S. Kreher, of counsel, Stephen L. Yonaty, of counsel), Buffalo, NY, for Debtor.

Nixon Peabody LLP (William S. Thomas, Jr., of counsel, Gregory J. Mascitti, of counsel), Rochester, NY, for JP Morgan Chase Bank as Agent to the Debtor's Secured Lenders.

Akin Gump Strauss Hauer & Feld LLP (Michael S. Stamer, of counsel, Abid Qureshi, of counsel, Tess H. Autrey, of counsel), New York City, for DDJ Capital Management.

Kronish Lieb Weiner & Hellman LLP (John A. Morris, of counsel, Lawrence C. Gottlieb, of counsel, Eric J. Haber, of counsel, Scott J. Pashman, of counsel), New York City, for The Official Committee of Equity Security Holders.

CARL L. BUCKI, Bankruptcy Judge.

The officers and directors of a corporation owe a fiduciary obligation to shareholders. This obligation continues even in the context of bankruptcy, and demands an equality of treatment as among all owners of the company. The bankruptcy process allows no room for self-dealing by officers and directors of a publicly traded enterprise. In the instant case, where unsecured creditors are to paid in full, the central issue is whether a proposed plan violates these fundamental rights of shareholders.

In this chapter 11 case, the Official Committee of Equity Security Holders (the "Equity Committee") asks that this court deny confirmation of the debtor's plan of reorganization on three grounds. First, the committee asserts that the plan fails to satisfy the absolute priority rule as set forth in 11 U.S.C. § 1129(b). During four days of intense trial, the parties have presented markedly contrasting views of the fair value of the reorganized debtor. This value is critical to the issue of whether a proposed stock distribution will cause secured creditors to receive more than the outstanding balance on their claims. Second, the committee challenges a proposed grant of general releases. Noting the debtor's intention to provide a "golden parachute" for its principal officer, the committee thirdly asserts that the plan fails to satisfy the good faith requirement of 11 U.S.C. § 1129(a)(3).

Bush Industries, Inc., filed a petition for relief under chapter 11 of the Bankruptcy Code on March 31, 2004. From the beginning of this case, in motions filed with its petition, the debtor indicated that it had reached agreement with the majority of its secured creditors as to the terms of a reorganization plan. Pursuant to that agreement, the debtor filed a disclosure statement and plan on April 23, 2004. After a hearing on notice to all creditors, this court approved a Second Amended Disclosure Statement and scheduled a hearing to consider confirmation of the plan that is now the subject of dispute.

In its disclosure statement, the debtor describes itself as "a diversified global furniture manufacturer and supplier of surface technologies." With headquarters in Jamestown, New York, Bush Industries has as its core business the manufacture of ready to assemble furniture. After witnessing a steady growth in revenue during the 1990's, the management of Bush Industries implemented strategies that it hoped would assure continued growth for the company. These strategies included the acquisition of Röhr Gruppe, Inc., a German furniture manufacturer, and the Color Works, Inc., a company that applies decorative finishes to such surfaces as the face pieces of cellular telephones. With expectations of continued growth, Bush Industries invested $30 million in the acquisition of new equipment during the first quarter of 2000. Additionally, during the second quarter of 2000, the debtor increased its inventory by approximately $30 million. Then, during the later part of 2000, the economy began to weaken and Bush Industries started to encounter serious financial difficulties.

In response to the company's financial problems, management implemented a non-bankruptcy restructuring plan. It closed three retail outlets and a manufacturing facility in St. Paul, Virginia. It eliminated unprofitable product lines. Despite these efforts, the company continued to incur losses. Consequently, in July 2003, the company retained FTI Consulting, Inc., a crisis management and restructuring consulting firm. Although Bush Industries adopted additional cost cutting measures and management changes, deteriorating financial performance caused cov-

enant defaults under the debtor's credit facility during the third quarter of 2003. Meanwhile, the debtor failed in attempts to raise capital through a sale of its German subsidiary or through a new facility of mezzanine financing. Then in February 2004, the company's secured creditors denied a request for an eighteen month extension of its outstanding credit facility. On March 29, 2004, after what the debtor describes as "protracted negotiations", Bush Industries signed a Lock Up and Voting Agreement with seven of the eight participants in the pre-petition credit facility. Two days later, pursuant to that agreement, Bush Industries filed its petition for relief under chapter 11.

In its bankruptcy schedules, Bush Industries lists obligations totaling $180 million. Of this amount, as of the bankruptcy filing, the debtor owed $158 million to eight secured creditors under the terms of a certain Credit and Guarantee Agreement dated as of July 26, 1997 (the "Pre–Petition Credit Facility"). Seven of these eight creditors then became parties to the Lock Up and Voting Agreement. Pursuant to the Lock Up and Voting Agreement, the seven participating creditors promised post-petition financing to the debtor. In addition, the debtor agreed to propose and the participating creditors agreed to support a reorganization plan with terms as described in the Lock Up and Voting Agreement. The debtor's Second Amended Plan of Reorganization essentially incorporates these terms.

In its plan of reorganization, the debtor proposes full payment of all creditors other than the members of class 3, which consists of the eight lenders under the Pre–Petition Credit Facility. In exchange for their secured claims of more than $158 million, the class 3 creditors will receive a proportionate interest in each of two secured notes, together with a pro-rata distribution of new common stock in the reorganized debtor. The two secured notes are respectively in the amounts of $50 million and $15 million. The plan also requires the cancellation of all pre-petition stock of Bush Industries, Inc. Upon issuance of the new common stock, therefore, the members of class 3 will own the reorganized debtor. Further, the plan proposes to provide releases to a number of individuals and entities. Under the plan, the debtor will also continue to employ Paul S. Bush, who had resigned as Chairman, Chief Executive Officer and director of the debtor and its subsidiaries as of March 29, 2004.

Although a party to the Pre–Petition Credit Facility, HSBC Bank had declined to sign the Lock Up and Voting Agreement and had filed written objections to the debtor's plan. Just hours before the hearing on confirmation, however, HSBC sold its interest at a discount to other members of Class 3. As a consequence, at confirmation, the holders of class 3 claims voted unanimously to support the Second Amended Plan. Proposing to pay the other claims in full, the plan did not impair any other class of creditors. Earlier in these proceedings, this court had approved the appointment of the Equity Committee. In view of the plan's proposal to cancel the interests of the pre-petition stockholders, the Equity Committee has presented the only continuing objections to confirmation.

### Standard of Proof

In chapter 11, this court can confirm only those plans which satisfy the requirements of 11 U.S.C. § 1129. The Equity Committee contends that the proponent of the plan carries a burden to demonstrate these requirements by evidence that is clear and convincing. Contesting this standard, the debtor asserts that it carries a burden of proof by only a preponderance of evidence. Although the

Court of Appeals for this circuit has yet to address this issue definitively, I join the majority view that would mandate the lesser standard of proof by a preponderance of evidence. *See Matter of Briscoe Enterprises, Ltd., II,* 994 F.2d 1160 (5th Cir. 1993), *In re Cellular Info. Sys.,* 171 B.R. 926, 937 (Bankr.S.D.N.Y.1994); *In re 8315 Fourth Ave. Corp.,* 172 B.R. 725 (Bankr. E.D.N.Y.1994), 7 ALAN N. RESNICK & HENRY J. SOMMER, *Collier on Bankruptcy* ¶ 1129.02[4](15th ed. rev.2004).

The text of section 1129 does not mandate any extraordinary standard of proof. Impliedly, therefore, this court should apply the standard that is generally applicable to civil disputes. In a different bankruptcy context, the Supreme Court has identified this standard as proof by a preponderance of the evidence. "Because the preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants, we presume that this standard is applicable in civil actions between private litigants unless 'particularly important individual interests or rights are at stake.'" *Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), *quoting Herman & MacLean v. Huddleston,* 459 U.S. 375, 389–390, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

An equal allocation of the risk of error is particularly appropriate in determining value for purposes of plan confirmation. Both creditors and stockholders share the same interest in the outcome of a favorable valuation. An inappropriately high valuation will deny to creditors the right to assets without allocation for the interest of equity. On the other hand, an inappropriately low valuation will deny to equity the right to assets after allocation for the interest of creditors. From the competing perspectives of debt and equity, the risks of error are essentially mirror images of

each other. Accordingly, the debtor should carry the burden to establish the requirements of confirmation by a preponderance of evidence.

Absolute Priority Rule

Section 1129(a) of the Bankruptcy Code states that the court may confirm a plan of reorganization only upon satisfaction of each of 13 requirements. The eighth requirement is that "[w]ith respect to each class of claims or interests—(A) such class has accepted the plan; or (B) such class is not impaired under the plan." Section 1126(g) provides, however, that "a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests." Because the debtor's plan proposes to cancel all pre-petition shares of stock, the equity class is deemed to have rejected the plan. Confirmation, therefore, requires reliance upon the "cram-down" provisions of 11 U.S.C. § 1129(b). In relevant part, subdivision (b)(1) provides that if the plan satisfies all but the eighth requirement for confirmation, "the court, on request of the proponent of the plan, shall confirm the plan ... if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." Section 1129(b)(2)(C) then provides that the condition that a plan be fair and equitable includes the following codification of what is generally referred to as the absolute priority rule:

> With respect to a class of interests—(*i*) *the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to* the greatest of the allowed amount of any fixed liquidation prefer-

ence to which such holder is entitled, any fixed redemption price to which such holder is entitled, *or the value of such interest;* or (ii) the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

(emphasis added). In the present instance, the Equity Committee asserts that the fair value of the debtor exceeds the amount of all outstanding claims. To the extent that such value exists, the plan fails to distribute property at least equal to the value of the interest of the equity class. In the view of the Equity Committee, therefore, the plan fails to satisfy the requirements of 11 U.S.C. § 1129(b), and accordingly fails to override the requirement of 11 U.S.C. § 1129(a)(8).

■ As proponent of the plan, the debtor carries the burden to show by a preponderance of the evidence that the plan is fair and equitable within the meaning of the cram down provisions of section 1129(b). Throughout the hearing on confirmation, the debtor and the class 3 secured creditors asserted that the reorganized debtor would have a value less than the so called "equity bogey" or "equity hurdle", that is, the total of all outstanding claims, whether secured, administrative, priority, or unsecured. The essence of their contention was that the business lacked sufficient value to allow any equity for the benefit of stockholders. In support of this position, the debtor offered the expert testimony of H. Sean Mathis of Miller Mathis & Co., LLC. Affirming his conclusion was John K. Suckow of Alvarez & Marsal, LLC, an expert retained by the secured creditors. After the debtor concluded its case, the Equity Committee presented the expert testimony of James W. Harris, from Seneca Financial Group, Inc. His report found that Bush Industries had

value in excess of claims, so as to require some distribution to stockholders. In further support of this finding, the Equity Committee also elicited the testimony of Brian K. Pearson from Valuation Advisors, a company which had prepared a preliminary analysis of value at the behest of the debtor.

Our analysis of the evidence must begin with a calculation of outstanding claims against the bankruptcy estate. In his report on behalf of the Equity Committee, Mr. Harris calculated outstanding claims of $182,030,000. After subtracting cash generated from operations in the amount of $13,667,000, he concluded that net claims on the debtor's enterprise value were $168,363,000. Subsequent to the trial, the debtor's counsel submitted a supplemental affidavit indicating a higher level of claims in a range between $181.89 and $186.99 million. In response, Mr. Harris prepared an affidavit that challenged the debtor's adjustments. To resolve these differences, the court would need to conduct an evidentiary hearing. For purposes of the present decision and in the context of its outcome, however, it will suffice to accept the calculation of the Equity Committee and its expert. The determining issue, therefore, is whether the reorganized debtor will have a value in excess of $168,363,000.

■ Assets can be valued for many different purposes. Each particular purpose requires an appropriate approach and methodology for valuation. In the present instance, for example, the debtor's consolidated balance sheet for May of 2004 showed total assets of $289,029,000. That, however, is a statement based upon historical cost, without necessarily an appropriate adjustment for subsequent circumstances. On the other hand, in its disclosure statement, the debtor reported that its assets would have a liquidation

value no greater than $87,174,000. This, however, is a hypothetical future value in the event of a failure to reorganize. For purposes of the cram down provisions of 11 U.S.C. § 1129(b), the debtor must demonstrate its present value as a reorganized entity. In its decision in *Consolidated Rock Products Co. v. Du Bois*, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982 (1941), the Supreme Court established the controlling standard for this valuation:

> As Mr. Justice Holmes said in Galveston H. & S. A.R. Co. v. Texas, "the commercial value of property consists in the expectation of income from it." Such criterion is the appropriate one here, since we are dealing with the issue of solvency arising in connection with reorganization plans involving productive properties. It is plain that valuations for other purposes are not relevant to or helpful in a determination of that issue, except as they may indirectly bear on earning capacity. The criterion of earning capacity is the essential one if the enterprise is to be freed from the heavy hand of past errors, miscalculations or disaster, and if the allocation of securities among the various claimants is to be fair and equitable.

312 U.S., at 526, 61 S.Ct. 675 (citations deleted). Accordingly, the appropriate valuation of Bush Industries is to be grounded upon its earning capacity as a reorganized entity.

■ Each of the expert witnesses applied one or more of three methodologies that are designed to calculate enterprise value from expectations of future income. These methodologies are the comparable companies analysis, the comparable transaction analysis, and the discounted cash flow analysis.

Under the comparable companies analysis, the appraiser calculates value by examining the trading ranges of comparable publicly traded companies. These trading ranges are viewed as a multiple of an earnings standard, such as EBIT (that is, earnings before interest and taxes) or EBITDA (that is, earnings before interest, taxes, depreciation and amortization). These multiples are then applied to the same earnings standard of the company being valued, in order to determine its enterprise value.

The comparable transaction analysis determines value by examining the consideration paid to acquire an entity through a public merger or acquisition. Much like a comparable companies analysis, the disclosed purchase price is viewed as a multiple of an appropriate earnings standard. To calculate enterprise value, the resulting multiple is again applied to the same earnings standard of the subject company.

Under a discounted cash flow analysis, enterprise value is calculated as the sum of two parts. The first is the present value of the subject's projected unlevered free cash flow. Unlevered free cash flow represents the cash flow that a company is projected to generate during a specified period of time if it were to have no debt in its capital structure. To calculate the present value of this cash flow, the appraiser discounts the unlevered free cash flow by the weighted average cost of capital. In a discounted cash flow analysis, the second part of enterprise value consists of the company's terminal value. Terminal value represents the remaining value of an entity after the period during which the unlevered free cash flow was projected. An appraiser may calculate terminal value either by assuming a perpetual growth rate of terminal unlevered free cash flow, or as a multiple of the company's terminal EBITDA.

Although the four experts shared a common acceptance of appraisal theory and methodologies, they reached vastly differ-

ent conclusions about the value of the reorganized debtor. On behalf of the debtor, Sean Mathis estimated an enterprise value of $104 million. Consistent with this result was the finding of John Suckow that the reorganized debtor would have a value between $95 and $130 million. In contrast, James Harris on behalf of the Equity Committee estimated an enterprise value of $200 million, a sum far in excess of net claims against the estate. The final expert, Mr. Pierson, equivocated somewhat in his testimony. The Equity Committee directs the court's attention to a written report indicating an estimated value between $194 and $233 million exclusive of Bush's German subsidiary, while the secured creditors point to Pearson's oral testimony setting a value of $138.2 million for the same assets.

Each of the experts favorably impressed the court, which found all of them to be qualified, knowledgeable, and credible. Their credibility, however, is limited to the scope of testimony. For this reason, the court must discount the opinion of Brian Pierson. Originally retained by the debtor, Mr. Pierson appeared under subpoena by the Equity Committee. Pierson never completed a comprehensive report and he did not perform a discounted cash flow analysis of the debtor. Being of a preliminary nature, the Pierson report lacks the specificity that this court would need for a thorough assessment and review. I accept the Pierson report for what it is: an incomplete assessment having no persuasive impact on the decision of this court. In contrast, Mathis, Suckow and Harris each presented a comprehensive report that allows this court to discern the underlying bases for their divergent conclusions.

In certain respects, Mathis, Suckow and Harris agree substantially with each other. Each utilized a discounted cash flow analysis as an important part of their assessment. As noted above, the discounted cash flow analysis calculates enterprise value as the sum of the present value of projected unlevered free cash flow and the subject's terminal value. In their respective reports, the witnesses found a similar value of projected unlevered free cash flow, such that the differences have no material impact on total enterprise value. Rather, the disparity of result is attributable largely to differences of terminal value. Notably, Harris found a terminal value between $65 and $80 million greater than that calculated by Mathis and Suckow. In determining a terminal value, Harris used only an EBITDA model, while Mathis and Suckow used both an EBITDA model and a perpetual growth model. Although these two methodologies provide an appropriate test of each other, it will suffice for purposes of the present discussion to consider only the methodology upon which all experts have agreed. With respect to the EBITDA model, the disparity of terminal values derives predominantly from the use of significantly different exit multiples. Specifically, Harris used an exit multiple of 9.0, while Mathis and Suckow used exit multiples respectively of 6.5 and 6.0. This difference of exit multiples explains fully the divergent outcomes in the discounted cash flow analysis. Indeed, an exhibit to the Harris report indicates that without changing any other assumption, the use of a 6.5 exit multiple would produce an enterprise value less than the equity hurdle.

Although the comparable companies analysis and the discounted cash flow analysis are distinct methodologies, they are interrelated in one critical respect. In their discounted cash flow analysis, each of the experts used the exit multiple that he had calculated through his comparable companies analysis. Similarly, these exit multiples account for the corresponding disparities in the values derived from the

comparable companies analyses by the three expert witnesses. Accordingly, the present dispute essentially relates to the calculation of the appropriate exit multiple. Underlying this methodology is the premise that fair enterprise value equals the product of the exit multiple and an appropriate earnings standard. To the extent that an appraiser knows the enterprise value of comparable companies and their EBITDA or some other appropriate standard of earnings, then that appraiser can calculate an exit multiple. For this methodology to work, however, the expert must select comparable companies that are truly similar to the debtor. Therein lies the essential challenge to the calculation of enterprise value in the present instance.

In their comparable companies analyses, the three experts collectively made comparison to 17 companies. Although each manufactures furniture, the debtor exhibits meaningful differences. Unlike all but one of the other comparable entities, Bush Industries maintains as its core business the manufacture of ready to assemble furniture. Inherently, this business segment involves the manufacture of unassembled parts that are packaged for shipment in bulk. These products are easily transported over long distances, and fill the low end of market demand. For these reasons, the debtor's products are particularly vulnerable to competition from low cost producers, such as manufacturers in China. The testimony established that in contrast to makers of higher end furniture, the debtor could expect minimal benefit from brand loyalty. With no broadly based retail network, the debtor relies primarily upon sales through three or four discount chains. With a focus on price, these distributors would have greater inclination to divert business to lower cost competitors. Meanwhile, the ready to assemble furniture segment is unique in its need to address the pressure of rising costs from suppliers of raw material. The debtor presented uncontroverted testimony that its products have particle board as their essential component, that the world market presently exhibits a particle board shortage, and that this shortage limits the debtor's ability to purchase material at a favorable price. Essentially, the evidence established that manufacturers of ready to assemble furniture were encountering greater risks than those faced by other segments of the furniture industry.

In their testimony, all three experts acknowledged their inability to analyze comparable manufacturers of ready to assemble furniture. This segment of the industry includes only four companies, of which Bush was the only entity whose stock was publicly traded. Using data on the sale of bonds, Mr. Mathis was able to make comparison with one of these competitors, but opposing counsel effectively challenged the reliability of that comparison on cross examination. For this reason, in conducting their comparable market analyses, the experts were otherwise compelled to make comparison with manufacturers of other types of furniture. Nonetheless, differences among segments of the furniture industry should have required some adjustment in the mathematical computation of exit multiples. Accordingly, both Mathis and Suckow discounted their exit multiples to reflect the special risks of the debtor's manufacturing segment. Harris, however, made no adjustment.

The Equity Committee contends that Mathis and Suckow adopted a subjective adjustment to their exit multiples, and that the court should accord greater credence to the thoroughly objective report of Mr. Harris. I disagree both with the premise of this argument and with its conclusion. With its unique character, the "ready to assemble" furniture segment exhibits spe-

cial problems that compel distinction from other types of furniture manufacturing. Although a lack of appropriate comparable companies compelled the experts to rely upon data for manufacturers of other types of furniture, the appraisers would need to adjust for differences between the subject and comparable enterprises. A decision to make no adjustment is just as subjective as any decision about the magnitude of an adjustment. In the present instance, Mathis and Suckow clearly articulated the serious challenges facing the ready to assemble furniture industry. Qualified as experts, they appropriately expressed their opinion concerning a modification of the exit multiple.

After a thorough review of all of the evidence, this court finds that for purposes of both a comparable companies analysis and a discounted cash flow analysis, the appropriate multiple would not exceed 6.5. Under all three expert reports, the application of this multiple produces an enterprise value less than $168,363,000, that being the net balance due on outstanding claims as calculated by the Equity Committee's expert. This outcome is further confirmed by two other considerations: the results of comparable transaction analyses and market conditions.

In addition to performing a comparable companies analysis and discounted cash flow analysis, Harris and Mathis also performed a comparable transaction analysis. The comparable transaction analysis indicated a value of $75,249,000 in the Mathis report, and $165,400,000 in the Harris report. We need not attempt to explain these differences, in as much as both outcomes indicate a value less than the equity hurdle and therefore confirm the necessary finding of this court.

Market conditions also confirm the absence of any enterprise value in excess of outstanding liabilities. As of the filing of the debtor's bankruptcy petition, the stock of Bush Industries had only speculative value. Several of the secured creditors under the Pre–Petition Credit Facility chose to liquidate their positions at a discount. Prior to its bankruptcy filing, the debtor failed in attempts to secure new financing. This lack of confidence in the marketplace continued even after bankruptcy. Within hours of the start of the hearing on plan confirmation, HSBC sold its secured position at a discount. Although the court has received no evidence of the magnitude of that discount, investors were willing to accept less than full value for the face amount of a claim that was superior to the interests of any equity holders.

Based upon all of the evidence and circumstances of this case, the court finds by a preponderance of the evidence that the enterprise value of the debtor does not exceed the sum of all outstanding claims against the estate. Accordingly, a cancellation of pre-petition stock does not, *per se*, violate the absolute priority provisions of 11 U.S.C. § 1129(b).

Release of Debtor Claims

The Second Amended Plan includes provision for the debtor to grant releases to holders of the Pre-petition Credit Facility and to their present or former officers and employees, as well as to the debtor's current and former employees, officers and directors. The Equity Committee objects to these releases. It contends that the estate will receive no consideration for the releases, and that the releases are not necessary to the debtor's reorganization.

■ With respect to releases for the holders of the Pre–Petition Credit Facility and their officers and employees, the objection of the Equity Committee is overruled. As an impaired class, the holders of the Pre–Petition Credit Facility have

agreed to compromise their claim and to accept stock in partial satisfaction of debt. As noted above, this arrangement will satisfy the absolute priority rule. The plan proposes only a release from the debtor and its subsidiaries, and the release is limited to claims that relate to the reorganization case, the plan, or the various credit agreements. Meanwhile, the Equity Committee has identified no actual counterclaim that the debtor might assert against the holders of the Pre–Petition Credit Facility. Notably, the plan does not impose a release of any third party claims. Under these circumstances, the debtor has received adequate consideration for its release. In any settlement, parties look not only to resolve disputes but to avoid future contention. So too, in this instance, holders of the Pre–Petition Credit Facility could properly seek a general release as a further condition for their consent to a compromise of claims.

At the conclusion of the hearing on confirmation, this court asked the parties specifically to address the propriety of general releases to the officers and directors of the debtor. In connection with the purchase of stock, current and former management owes approximately $2.5 million to the debtor. Thus, the proposed general releases include a waiver of recognized claims. Subsequent to the hearing on confirmation, in response to the objection of the Equity Committee, the debtor amended its plan to delete the provision for the release of claims against current and former directors, officers, and employees. This modification effectively resolves any objection to the grant of releases, but it suggests other issues that the court will hereafter discuss, with regard to good faith and contractual rights under the Lock Up and Voting Agreement.

### Good Faith

Section 1129(a)(3) of the Bankruptcy Code provides that the court may confirm a plan only if it "has been proposed in good faith and not by any means forbidden by law." The Equity Committee asserts an absence of good faith for essentially two reasons: first, that the Lock Up and Voting Agreement limited the debtor's ability to seek maximum value for shareholders; and second, that management instead negotiated a plan that would provide a "golden parachute" for its principal officer. The court finds no merit in the first of these grounds. The second concern is far more troubling, and presents a further issue of how properly to cure the breach of a corporate officer's fiduciary obligations to shareholders.

■■ The Lock Up and Voting Agreement established the terms of the debtor's plan and obligated its signatories to promote and support confirmation. Noting that the agreement precluded consideration of any alternative plan, the Equity Committee contends that the debtor effectively limited its ability to seek a greater return for shareholders. In the committee's view, this limitation represents a lack of good faith. I disagree. Life is not a computer simulation, through which one can test how variations of action will affect outcome. Perhaps shareholders might have enjoyed a greater recovery without the limiting impact of the Lock Up and Voting Agreement. On the other hand, this agreement also provided assurances of post-petition financing and of support for the plan by the only class of impaired creditors. Without the Lock Up and Voting Agreement, the debtor might have been unable to effect any distribution to general unsecured creditors. Nothing in the Bankruptcy Code requires a debtor to seek a distribution to the shareholders of a company that lacks equity value in excess of outstanding debt. Rather, section 1129(a)(3) commands only that the debtor

strive in good faith and by proper means to effect a plan that satisfies the requirements of the Bankruptcy Code. A lock up agreement does not *per se* indicate a lack of good faith. In light of the risks attendant to the present case, the debtor did not violate any duty of good faith by accepting a lock up agreement that would effectively limit competing options.

■ Although a debtor may in good faith negotiate a lock up agreement, the particular terms of any resulting plan must themselves be proposed in good faith and not by any means forbidden by law. I agree with the contention of the Equity Committee that the debtor violated this requirement when it negotiated to include into the Lock Up and Voting Agreement a revised contract for employment of Paul S. Bush. Because section 1129(a)(3) speaks more to the process of plan development than to the content of the plan, amendments that merely change outcome may not necessarily remedy the underlying deficiency.

Until March 29, 2004, Paul S. Bush served as Chairman and Chief Executive Officer of Bush Industries, Inc. On that date, the company's Board of Directors gave its approval to the Lock Up and Voting Agreement. After voting in favor of this agreement, Mr. Bush resigned as both an officer and director. Two days later, the company filed for protection under chapter 11. Despite his resignation, Mr. Bush has continued to receive his regular salary pursuant to the terms of an employment agreement dated July 29, 1992 (the "Employment Agreement"). Among other provisions, the Employment Agreement sets Mr. Bush's salary at $630,000 per year, in addition to other benefits. The agreement also provides that in the event of termination without good cause, Mr. Bush shall receive severance pay at his contractual salary for an additional 36 months.

Section 365 of the Bankruptcy Code allows a debtor to reject an executory contract such as the Employment Agreement. Upon rejection of this agreement, however, Mr. Bush could assert a claim for damages. During the confirmation hearing, counsel for the secured lenders expressed the view that appropriate damages might be calculated as the sum due for severance pay, and that severance pay would be allowed administrative priority under the decision of the Second Circuit in *Straus–Duparquet, Inc. v. Local Union No. 3, Int'l. Bhd. of Elec. Workers (In re Straus–Duparquet, Inc.)*, 386 F.2d 649 (2nd Cir. 1967). That case, however, involved the priority for severance pay linked to longevity of employment under a collective bargaining agreement. In contrast, Mr. Bush's Employment Agreement is a personal services contract that allows severance benefits that are essentially the same as those which the Honorable Robert E. Gerber recently considered in *In re AppliedTheory Corporation*, 312 B.R. 225 (Bankr.S.D.N.Y.2004). For all of the same reasons stated by Judge Gerber, I believe that a rejection of Mr. Bush's contract would create not an administrative claim, but a general unsecured claim that is subject to the limitations of 11 U.S.C. § 502(b)(7). Pursuant to this section, damages from rejection of an employment contract are generally capped at the agreed level of compensation for a period of one year.

Rather than to contemplate rejection of the Employment Agreement, the Lock Up and Voting Agreement mandated a renegotiated contract to employ Paul Bush at an annual salary of $500,000 for each of four years. Either Mr. Bush or the reorganized debtor can terminate the contract after one year. Upon termination, howev-

er, Mr. Bush would receive severance in an amount equal to the entire balance of salary payable over the life of the agreement. In addition, the renegotiated contract would allow to Mr. Bush a bonus of $1,799,990, upon the company's receipt of the cash value of an outstanding life insurance policy. Finally, the renegotiated contract includes a non-compete agreement.

If the parties to the Lock Up and Voting Agreement had truly intended for Paul Bush to render services comparable to his previous work, then this court could use the Employment Agreement as a gauge to test the reasonableness of any renegotiated level of compensation. Instead, the evidence [1] demonstrates an intent to prefer Mr. Bush with a "golden parachute." Mr. Bush is 68 years old and has sold his home in New York State, the site of the debtor's principal place of business. Although the debtor maintains a design studio near Mr. Bush's new residence in Florida, Mr. Bush will no longer fulfill the duties of chief executive officer. Because a highly compensated vice-president already manages the design studio, Paul Bush is unlikely to assume any influential or necessary role in the reorganized debtor. Notably, the renegotiated agreement allows Mr. Bush to terminate his employment relationship after one year and still receive the same compensation as if he had continued his relationship over four years. Under the renegotiated agreement, Paul Bush can expect to receive salary, severance and a bonus in the total amount of $3,799,990. Both the Employment Agreement and its proposed modification are complex arrangements. Without argument of counsel, this court will not attempt to quantify the precise difference between the consideration that Paul Bush would receive under a revised agreement and the damages that he might claim upon rejection of the Employment Agreement. Nonetheless, the base for damages would be his current annual salary of $630,000. While the debtor may also receive the benefit of a covenant not to compete and the value of whatever services Paul Bush might render, it is clear that the proposed modification represents an enhancement of Mr. Bush's recovery from the debtor.

■ The Bankruptcy Code does not absolutely prohibit a reorganized debtor from entering into any type of employment agreement, even an improvident one. To the extent that a "golden parachute" impairs only the rights of a consenting class of creditors, this court will not necessarily deny confirmation. So long as allowed claims exceed the value of a reorganized debtor, the class of pre-petition interest holders has no inherent right to object to an employment contract whose cost is effectively paid by new owners of the reorganized debtor. Nonetheless, interested parties may in all instances challenge the manner in which an employment contract was negotiated. While other provisions of 11 U.S.C. § 1129(a) speak to the content of a plan, subdivision (a)(3) imposes a strict mandate for proper process and methodology. In the present instance, a problem arises not merely from the terms of the renegotiated employment contract, but from the fact that those terms belie the requirement that the plan be proposed in

---

1. At trial, the Equity Committee moved for the admission of portions of transcripts of several depositions, including an examination of Paul A. Bush. Opposing counsel consented to this admission, but only on condition that the full text of all transcripts be admitted into evidence. The Equity Committee objected to this condition on grounds of relevance, and the court took the issue under advisement. Upon full review of the transcripts, the court has determined that all portions have sufficient relevancy to allow for their admission under Rule 32 of the Federal Rules of Civil Procedure.

good faith and not my any means forbidden by law.

■ Prior to approval of the Lock Up and Voting Agreement, Paul S. Bush held a controlling interest in the stock of the debtor and served as its Chief Executive Officer and as Chairman of its Board of Directors. In these capacities, Mr. Bush held the position of a fiduciary with respect both to the corporation and to its stockholders. *See* HARRY G. HENN, LAW OF CORPORATIONS, § 235, at 457 (2nd ed.1970). As a fiduciary, he owed a duty to act in good faith and without self dealing. Accordingly, corporate directors are obligated "to shareholders in general and to individual shareholders in particular to treat all shareholders fairly and evenly." *Schwartz v. Marien*, 37 N.Y.2d 487, 491, 373 N.Y.S.2d 122, 335 N.E.2d 334 (1975). These fiduciary duties arise "from the fact that shareholders are owners of the corporation and they expect to share in its profits, and when a director or other officer benefits himself at the expense of the corporation, he breaches his duty to the shareholders by preventing them from realizing their expectations to share fairly in the corporate fortunes." 14A N.Y. JUR. 2D *Business Relationships*, § 683 (1996).

■ In bankruptcy, officers and directors owe a primary duty to maximize the return to creditors. *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). Nonetheless, this responsibility to creditors does not eliminate the fiduciary obligation to provide an equality of treatment among shareholders. Typically, when unsecured creditors are to receive less than full payment, shareholders are uniformly distressed by a loss of all equity. Indeed, section 1129(b)(2)(B) of the Bankruptcy Code provides generally that a plan is fair and equitable to an impaired class of unsecured creditors only when shareholders receive no distribution. Of course,

with the acquiescence of creditors, shareholders may retain some interest or benefit. In negotiating such provisions, however, officers and directors must still satisfy their underlying fiduciary obligations.

While Paul Bush was still an officer and director of the debtor, the secured creditors and Mr. Bush's personal counsel directly negotiated the terms of a revised employment agreement. With Paul Bush as its chair, the Board then accepted that revised employment agreement as a component of the Lock Up and Voting Agreement. Despite the preferred treatment that the agreement gave to Paul Bush, the board chose not to propose an alternative of equal cost for the benefit of all shareholders. By reason of the renegotiated contract, the secured creditors paid value in excess of a fair consideration for the business. Due to his controlling stock position, Mr. Bush was able to secure a promise for what is essentially a bonus that would be distributed to himself and without concern for minority stock interests. In this way, he violated a fiduciary obligation. By reason of this violation, the plan has been proposed by means forbidden by law and in contradiction of the requirement of good faith.

Like Paul Bush, the other officers and directors of the corporation also owed a fiduciary duty to shareholders. Due to their positions of control, they also were able to secure a personal bonus in the form of the release of liability on loans relating to the stock purchase plan. In their negotiations on behalf of the debtor, by giving priority to a resolution of personal liability, they violated their duty to advance equally the interests of all shareholders.

This court fully appreciates the consequences of bankruptcy for senior management. Having spent a lifetime working to build the company, Paul Bush undoubtedly feels that he deserves a more substantial

severance. Insult compounds injury when an individual not only loses the value of an investment, but remains liable for its original purchase price. Although the bankruptcy process strives to maximize recovery, some right or interest is compromised in virtually every case. Balancing the interests of all parties, the Bankruptcy Court must apply the statutory and legal standards of fair distribution. While senior management will undoubtedly suffer from this bankruptcy, so too will many innocent investors. As among all of these interests, the court must assure not only a fair outcome, but also a process that works to achieve that result.

The law does not mandate an inflexible uniformity of result for all stockholders in every instance. Rather, the applicable standard is that stated by the New York Court of Appeals in *Alpert v. 28 Williams St. Corp.*, 63 N.Y.2d 557, 483 N.Y.S.2d 667, 473 N.E.2d 19(1984). The duty to provide good and prudent management

> demands that decisions be made for the welfare, advantage, and best interests of the corporation and the shareholders as a whole. But it has long been recognized in this State that, under certain circumstances, 'the particular interest of the few must give way to the general interest of the many.' Thus, '[d]eparture from precisely uniform treatment of stockholders may be justified, of course, where a bona fide business purpose indicates that the best interests of the corporation would be served by such departure.'

63 N.Y.2d at 572, 483 N.Y.S.2d 667, 473 N.E.2d 19 (citations omitted) (alteration in original). In the present instance, however, the court can discern no reason why the interest of the reorganized debtor would be served by a "golden parachute" for Paul Bush. Nor did the debtor even attempt to justify the forgiveness of loans

owed by the pre-petition officers and directors of the corporation. These provisions entail a cost for the reorganized debtor. With equal benefit to the corporation, that same cost could finance a distribution to all stockholders.

### Curing Plan Defects

█ After the hearing on confirmation, the debtor amended its plan to delete provisions for acceptance of the renegotiated contract for employment of Paul Bush. Instead, the debtor has announced its intention to seek post-confirmation approval of that agreement. Similarly, the debtor has amended its plan to eliminate the proposed releases for corporate management. If the Equity Committee had grounds to object only to the substance of the original provisions, this court might now be willing to confirm a plan containing all of the most recent amendments. However, in requiring that a plan be "proposed in good faith and not by any means forbidden by law", section 1129(a)(3) speaks to process. The new employment contract and releases essentially serve as evidence of a violation of fiduciary responsibility. The mere deletion of the offending evidence does not necessarily cure the underlying process by which the plan was originally negotiated. Rather, the debtor must demonstrate that its revised plan is now proposed in good faith and not by any means forbidden by law.

For the reasons stated herein, I have found that the debtor has no value in excess of outstanding debt. Nonetheless, the Lock Up and Voting Agreement allows what is essentially a bonus to Paul Bush and other corporate directors. However, officers and directors may not use their voting control to gain for themselves a disproportionate allocation of limited proceeds. By their acceptance of the Lock Up and Voting Agreement, the secured creditors have indicated a willingness to

pay a premium of value for control of the debtor. Now that the court has expressed its reticence to allow a distribution of that premium to the benefit of officers and directors only, the debtor amends its plan to propose a forfeiture of that premium altogether. Essentially, the current management has declared that if they cannot obtain for themselves the entire premium that the members of class 3 were prepared to allow, then no shareholder will enjoy that benefit. Unless management documents a good faith effort to obtain for all shareholders the premium that officers and directors were able to secure for themselves, the debtor fails to show that it has proposed a plan in good faith.

Based on the evidence at trial, this court is unable to quantify the value of either Mr. Bush's new employment contract or the releases. Any cost of the new employment contract may be offset by such factors as the value of a covenant not to compete, the value of any future services that Mr. Bush may render, and the damages that Mr. Bush might recover upon rejection of his pre-petition contract. Similarly, the cost of the releases depends upon the likelihood of recovery and collection on the underlying notes, as well as any offsetting effect of releases upon the compensation packages needed to retain key employees. Furthermore, new circumstances may have altered the willingness of creditors to pay the same value of premium as was previously proposed.

It is not the function of this court to dictate the terms of a Reorganization Plan. For the present, I merely rule that the plan fails to satisfy the requirements of 11 U.S.C. § 1129(a)(3), and for that reason only, cannot be confirmed. Nonetheless, I foresee no insurmountable barrier to confirmation of an appropriately revised plan. The debtor may demonstrate its good faith in a variety of ways. By way of example only, these may include proposals that will distribute to all shareholders the net cost of the previously proposed modification to the Employment Agreement and releases. Of course, the court does not foreclose the possibility of a different plan revision that the parties may newly negotiate in good faith. By this decision, the court does not mandate any distribution to shareholders. Rather, it requires only a demonstration that the debtor has proposed the final plan in good faith and not by any means forbidden under law, including the law of corporate governance. With the expectation that the parties can develop a confirmable plan in the imminent future, this court will by separate order schedule a status conference pursuant to 11 U.S.C. § 105(d).

The court has considered all of the other objections to the plan and finds them to be without merit. Nonetheless, for the reasons stated herein, the court must deny confirmation of the plan in its present form.

So ordered.